Hawkins, J.,
delivered the opinion of the Court.
*490 The substantial facts in this case, as I have been able to gather them from a confused, imperfect, and in some instances, wholly illegible record, seem to be these: Wm. Ruffin, Sr., died in July, 1857, after having made and published his last Will and testament, which was admitted to probate in the County Court of Shelby County, at the August Term, 1857, and which contains the following clauses, to-wit:
“Item 1st. It is my will and desire that my Executor, hereinafter made and named, shall pay all my just debts; and for the purpose of enabling him to do so, and to carry out the other provisions of this, my Will, I hereby authorize him to sell any and all of my estate, real, personal or mixed, either at public or private sale, on such terms as he may think proper; and hereby empower him to make any and all conveyances of the same, as fully and completely as though I were living and making the same in my own proper person.”
By the second clause, the testator directs that the property which he had before given to his son, James D. Ruffin, and to his daughter, Mary E. Tucker, should not be computed or taken into the account of his estate by his Executor.
By the third clause he gives to his son, James D., a certain family of negroes, which he had before that time sent to him.
The fourth clause is a follows, to-wit: *491 ion of my remaining estate, of every kind, nature and description. One-half of which I give and bequeath unto my son, James D. Ruffin, and his heirs, forever. I give and bequeath the other remaining half of my estate as follows: To my granddaughter, Margaret B. Anthony, formerly Margaret B. Tucker, I give the sum of five hundred dollars; to my grandson, William W. Tucker, the sum -of five hundred dollars; to my grandson, A. F. Tucker, Jr., the sum of five hundred dollars; and the residue of the half of my estate, not given to my grandchildren as above, I give and bequeath to my granddaughters, Sally R. Tucker, Mary E. Tucker and Agnes W. Tucker, share and share alike. That part of my estate given to my grandchildren under this item of my Will, shall be paid over or given at such times and in such manner as my Executor may deem most proper and beneficial to the respective parties.”
*490 “It is my will and desire, that after the foregoing-provisions of this, my Will, shall be carried out and accomplished, that my Executor will make an equal divis-
*491 The fifth clause is as follows, to-wit: “Should my Executor deem it most to the interest of my grand children above named, he may invest the amount that may be set apart to them, respectively, in such manner as he may, in his judgment, think mostly to their interest. I give and vest in my said Executor, full, complete and ample discretion in the settlement of my affairs, and with full powers to do every thing he may deem most proper for the interest of the parties concerned.”
By the sixth clause, the testator appoints his son, James D. Ruffin, Executor of said Will, in whom, he says: “I have the most unwavering confidence, both as *492 to judgment, discretion and fidelity:” and directs that no surety he required of Mm for the performance of his duties.
James D. Ruffin qualified and took upon himself the execution of the Will. The testator was the owner, at the time of his death, of a large estate, consisting, mostly, of certain town lots in the City of Memphis; some of which had valuable improvements upon them, while others were vacant and unimproved; stock in the Memphis Theatre, the Elmwood Cemetery, and in the Memphis Gras-light Company, and some money. All of which the Executor took into his possession immediately after his qualification.
The testator was largely indebted at the time of his death.
At some time afterward, but when, does not appear, but probably early in 1861, some sort of proceedings were instituted in the County Court of Shelby County, by the Executor, for the partition of the real estate of the testator; Commissioners were appointed, who, in March or April, 1861, as appears from a paper filed in this cause, attempted to make said partition; one of the Commissioners having died, the two survivors, on the 9th of February, 1866, nearly five years after their appointment, made out and signed a paper, purporting to be the action of said Commissioners, which has never been confirmed, and upon which no action, whatever, seems to have been taken.
But, from this paper, it appears, that said Commissioners allotted to James D. Ruffin, one lot on the corner of Shelby and Yance streets, in Memphis, valued *493 at $10,000; also, one lot on the corner of Main and Yance streets, in Memphis, valued at $7,500, making in the aggregate, $17,500.
To Sallie R. Coffee, formerly Sallie R. Tucker, and who, in the meantime, had intermarried with John D. Coffee, one lot on Exchange street, in Memphis, valued at $2,000; also, one lot on Lauderdale street, valued at $3,000, making in the aggregate $5,000.
To Mary E., and Agnes W. Tucker, certain lots on Main and Elliott streets, valued at $7,500, and $250 of stock in the Memphis theatre.
And to Margaret B. Anthony, Wm. W. Tucker, and A. J. Tucker, Jr., they allotted $1,500 of stock in the Elmwood Cemetery, in payment or satisfaction of the special legacies due them under the Will.
According to the estimate of the Commissioners, made in 1861, the whole real estate which they attempted to partition, amounted, in the aggregate, to the sum of $81,750; immediately after this attempted partition, Jas. D. Ruffin took possession, for himself, of the lots allotted to him, they being the only lots belonging to the estate of the testator yielding any income of consequence; and he has thus held and claimed and occupied them up to the time of filing this bill.
On the 4th of October 1859, the defendant, William Ruffin, who is the son of the defendant, James D. Ruf-fin, sold to John D. Coffee, the husband of the complainant, Sallie R., a tract of land in Panola County, Mississippi, at the price of $6,000, for the payment of which, Coffee executed his four notes for the sum of $1,500 each, due, respectively, at one, two, three and four years.
*494 On the 22d of March, 1861, none of said purchase money having been paid,’ Coffee and wife, acting under the impression that said attempted partition, (and in which, the lots on Exchange street and Lauderdale street had been allotted to Mrs. Coffee,) was effectual and valid, entered into an agreement with William Ruffin, by which it was attempted to substitute the wife to the rights of the husband, in said lands in Mississippi, upon the payment, by her, of the purchase money, or its equivalent, due from the husband to his vendor; and, in pursuance of this agreement, Coffee and wife addressed the following note to James D. Ruffin, to-wit:
Home, March 22d, 1861.

Gol. James D. Ruffin, Executor of Wm. Ruffin, deceased:

Dear Sir: — Please transfer to William Ruffin, Jr., the Exchange street property, valued at $2,000, and the Lauderdale street property, valued at $3,000, as apportioned to Sallie R. Coffee, for value received of him in land, it being part of S. 33, T. 6, and R. 8, West, which land he has legally obligated himself to transfer to Sallie R. Coffee, as soon as he can get the deed from DeWitt. Do this, and this shall be your receipt for $5,000, (five thousand dollars,) in part of my distributive share in my grandfather’s estate.
Sallie R. Coeeee.
JOHN D. Coeeee.
This letter or order, as it is called in argument, was delivered by Wm. Ruffin to his father, who, on the same day, indorsed thereon, “accepted with the within provisions, March 22d, 1861.
James D. Rueein, Ex’r of Wm. Ruffin.
*495 At the time of entering into this agreement, Wm. Ruffin executed a title bond to Mrs. Coffee, which, after reciting the facts of the sale of said land in Mississippi, by Wm. Ruffin to John D. Coffee, and the terms thereof, the execution of a title bond by Ruffin to Coffee, and the notes for the payment of the purchase money, further recites, “ and whereas, the said notes have been fully paid, with interest due thereon, by the aforementioned Sallie R. Coffee.” * * * “The receipt of which money is hereby acknowledged, from the said Sallie R. Coffee.” This title bond then further recites that the title bond given by Ruffin to John D. Coffee had been delivered to Ruffin; that he had transferred two of the notes given for the purchase money by Coffee; and by the terms of the bond of March 22, 1861, Ruffin binds himself, in the penalty of ten thousand dollars, to make to Sallie R. Coffee a title to said land, by the 1st of January, 1862. He further obligates himself to pay off and deliver to John D. Coffee, said two notes, transferred as before stated. Immediately after the purchase by Coffee, he took possession of said land, and afterwards, in 1860, expended large sums of money in the erection of valuable improvements thereon.
On the 9th of June, 1862, Wm. Ruffin, by deed of that date, in which his wife joined, conveyed said lands to Sallie R. Coffee, in consideration, as is recited in the deed, of said lots in the City of Memphis, allotted to Sallie R. Coffee, as before stated.
On the 10th day of January, 1866, Coffee and wife sold said tract of land to one Thompson, in consider *496 ation of witich., Thompson agreed to pay Sallie R. Coffee, $1,000 in cash, or in lieu thereof, four bales of cotton ■weighing 500 pounds each; and also, on or before the 1st day of January, 1867, to pay to her, sixty-two other bales of cotton, averaging five hundered pounds per bale. Coffee and wife executed a title bond, by which they bound themselves to make to Thompson a title to said land, upon the payment of the cotton.
James D. Ruffin, the Executor, has never conveyed either of the lots to Wm. Ruffin; but, on the 28th of May, 1862, Wm. Ruffin, having sold the lot on Exchange street, to one Sophia E. Cochran, for $3,100, James D. Ruffin, the Executor, conveyed the same to her by deed to her sole and separate use.
At the time of the qualification of the Executor, and until after the close of the late unhappy war, he was a resident of the State of Mississippi.
The defendant, Wm. Ruffin, was the private secretary of the testator, and familiar with his business, and property, for some time before his death, and resided in the city of Memphis; and after the death of the testator and qualification of his father as Executor, and until December, 1859, was the agent of the Executor, in taking care of, and renting out the real estate belonging to the estate of the testator, collecting rents, etc., and in attending generally to the business . connected with the administration.
The Executor has never returned any inventory of the estate — and never made any settlement of his administration, so far as we can see from this record, until 1862, nearly five years after his qualification; and in *497 that, wholly failed to charge himself with large sums for rents for 1860 and 1861, which he had received, and with which he ought to have charged himself. John D. Coffee is an unsafe, improvident business man; and intermarried with complainant, Sallie R., in 1858, at which time she was in her twenty-first year. At the time of filing this bill, the complainant, Mary E., had just attained her majority, and the complainant, Agnes, was still a minor. The farm in Mississippi was of the most inferior quality, was badly worn, and very much out of repair; and at the time of the transaction between Coffee and wife, of the one part, and Wm. Ruffin of the other part, the value of the farm — exclusive of improvements put on it by Coffee in 1860— was not more than equal to one-half the value of the two lots — as estimated by the Commissioners in 1861— which Coffee and wife directed, and the Executor agreed, should be conveyed to Wm. Ruffin, in consideration of the land; and which were, according to this record, worth from fifty to over one hundred per cent, more than the estimated value.
Under this general state of facts, as I have gleaned them from this record, Coffee and wife, Sallie R., Mary E. and Agnes Tucker, have filed this bill against James D. Ruffin and Wm. Ruffin, for a partition of the real estate of the testator, and for a settlement of the accounts of the Executor, and a full and final distribution of the estate under the Will. Complainants, Coffee and wife, insist that said order to James D. Ruffin, requesting him to convey said lots to Wm. Ruffin, is not valid and binding upon the wife; and she, by the *498 bill, repudiates tbe same; and the complainants ask that it be set aside and canceled, as a cloud upon their title, and for general relief.
The bill charges, that said Executor has committed large devastavits, thereby causing a loss to the estate, of from six to ten thousand dollars; that he paid six or eight thousand dollars of gambling debts, knowing them to be such at the time; that he has charged the estate with usurious interest, in his settlement with the County Court; and has, for several years, had in his hands a large amount of money belonging to the estate; and, for his own purposes, in 1861, attempted to have a partial partition of the real estate, which, it is alleged, is void, and by which he had assigned to himself the most valuable property in Memphis, and the only property belonging to the estate, which was improved or yielding any income, and took possession of the same as his own. Since which time, he has failed to account for the rents and profits of the same, which, it is alleged, are worth two or three thousand dollars per annum.
Complainants, Coffee and wife, allege, that at the time of the transaction between them and William Ruffin, they had no adequate knowledge, or means of ascertaining the interest of the wife in the estate, or the value of the lands referred to in the order addressed to the Executor; or of the great inequality of said pretended partition — which, they charge, together with the attempt of William Ruffin, to acquire the interest of complainant, Sallie R., was a fraud upon them — and by their bill, they say they are willing, either to pay the amount due on the notes given by John D. Coffee for the land in *499 Mississippi, or to substitute him to their rights under the sale to Thompson, after charging him with the value of improvements placed upon the land by complainant, John D., taking proper accounts of the rents and profits of said lots and the land.
The complainants admit the Executor has paid to them some small sums.
The Executor states, in his answer, that soon after the partition, in 1861, the real estate of the testator was seized and held' by the Grovernment of the United States, and thus he was kept out of the use and enjoyment of the same, from June, 1862, until some time after the surrender of the Confederate armies; and when he came from his home in DeSoto County, Mississippi, in April or May, 1865, he found -the property still in the possession of the Grovernment; when, for the purpose of protecting said property, and regaining possession of the same, he employed counsel, at an expense of fifteen hundred dollars; and thus, about the 1st of November, 1865, obtained an order, that the said property be restored to him; and has since paid out $1,000 for necessary repairs; and that, besides compensation for his services, the estate is indebted to him between seven and ten thousand dollars. He denies that he has wasted the estate; but, on the contrary, says he has used his utmost diligence and prudence in the management thereof, and has advanced his own means to sustain the estate. He denies having paid any gambling debts, and also denies all fraud, with which he is charged. He also files with his answer, an account, which purports to be his settlement with the County Court, in 1862, setting forth the items with which he is charga- *500 ble; also, the items for which, he is entitled to credits; by which he charges himself with $31,290.38, and charges the estate in his favor, with $35,173.11; thus showing a balance in his favor, of $3,882.73. He insists that complainants, Coffee and wife, are estopped from insisting upon another partition, by said order of the 22d of March, 1861.
The defendant, William Ruffin, states in his answer, among other things, that he supposed the proceedings in the County Court of Shelby County, for the partition of the real estate, were all regular, and never supposed there would be any difficulty about it, until this bill was filed. He says Coffee was very anxious to annul the first transaction as to the sale and purchase of the lands in Mississippi, and to give city property in exchange for the lands; and that respondent at first declined to do so, and never did consent to do so until after much entreaty, by both the husband and wife; and in support of this part of his answer, he files with his answer, what purports to be, a letter from Coffee to bim, dated March 7th, 1861, in which the author says: “In the meantime, you must make up your mind to give me $5,680 for that Lauderdale street and Exchange street property, which will be $3,500 for the Lauder-dale property, and $2,180 for the other. The property is cheap at this. Bob Moore told me, I could make Monzuratt, Dupree & Co. sell the Lauderdale piece next year for $8,000, easy.”
Respondent insists, that at the time of the transaction, in March, 1861, the land was worth as much as the city lots.
On the 3d of July, 1866, a decree was entered in *501 this cause, by consent, appointing Commissioners to partition all of said real estate, under the Will of Wm. Ruffin, deceased; and directing them to assign to Sallie R. Coffee, as part of her share, the lots on Exchange and Lauderdale streets, if the same could he done without prejudice. Also, directing the Master to take an account of the administration of said estate, and to make report of the same — all of which the decree provided should he without prejudice to the rights of Wm. Ruffin, or of Coffee and wife, as to the -matters in dispute between them.
The Commissioners proceeded to make said partition,- and to make report thereof, which being excepted to, an amended report was filed, which, being unexcepted to, was confirmed.
By this partition, there was allotted to Sallie R. Coffee, lot on Lauderdale street, at $6,000; lot on Exchange street, at $4,000; lot on Main street, north of Elliott street, at $3,750; and twenty shares of stock in the Memphis Theatre, at $500; and one share of Elmwood Cemetery stock, valued at $500; amounting, in the aggregate, to the sum of $14,750.
There was allotted to Mary E. and Agnes Tucker, lot on Main and Yance streets, at $21,250; lot on Main street, near Elliott, at $7,800; one share Elm-wood Cemetery stock, at $500 ; amounting, in the aggregate, to $29,550.
And there was allotted to James D. Ruffin, lot on the corner of Shelby and Yance streets, at $28,000; lot on Main street, corner of Elliott, at $16,500; and one share of Elmwood Cemetery stock, at $500-; *502 amounting, in the aggregate, to the sum of $45,000. Thus making the total value of the property partitioned $89,800, against $31,750 — the estimated value of the whole property partitioned in 1861, by Commissioners appointed by the County Court. It is, however, proper here to state, that, by the allotment of 1861, the Elmwood Cemetery stock was allotted to Margaret Anthony, Wm. W. Tucker, and A. F. Tucker, Jr., in satisfaction of the special legacies given them by the Will; and these special legacies, of $500 each, having been paid by the Executor before the last partition, said stock, valued at $1,500, was allotted to the other legatees; and under the provisions of the Will, after allotting to James D. Ruffin, one moiety of the estate partitioned, the remaining moiety was charged with the special legacies, and upon this latter partition no question is raised. Upon the hearing of the cause, the Chancellor refused to rescind, or cancel the order of Coffee and wife to the Executor, of the 22d of March, 1861, so far as it related to the lot on Exchange street; and decreed that said order be declared void, rescinded and canceled; and that the Executor be perpetually enjoined from complying with or executing the same, so far as it related to the lot on Lauderdale street; that the bill, so far as it relates to the relief prayed for, touching the lot on Exchange street, be dismissed; that the lot on Lauderdale street be charged with the payment of $3,000, the balance due Wm. Ruffin from John D. and Sallie R. Coffee, with interest from the date of the order, until paid; and, upon the failure of Coffee and wife to pay the same within sixty days from the date *503 of the decree, that so much thereof as might be necessary to pay the same be sold -without the equity of redemption, on a credit of six and twelve months — from which both parties have appealed to this Court.
It is conceded in argument, by council upon both sides, and we are of the opinion, that the Executor had full power, under the Will, to sell any, or all, of the estate of the testator, real, personal, or mixed, either to pay debts, or to effect a division of the estate, according to the terms of the Will.
And we t.bink it equally clear, that he had full power to make the division, and, at his discretion, to invest the amount set apart to the testator’s grandchildren, respectively, under the Will, in such manner as he might think most conducive to their interest; and to do everything he might deem most proper for the interest of the parties concerned. But, although it was conferred upon him, he has never exercised the power of dividing the estate. It does not seem to have been insisted in the Court below, nor has it been seriously contended here,, that any validity whatever can be given to the attempted partition in the County Court; and we are of the opinion, it was wholly inoperative and ineffectual in the accomplishment of a valid partition; and left the rights of the parties under the Will, precisely where they were before the attempt at partition was made.
But the power of the Executor to sell the lot on Exchange street, and the lot on Lauderdale street, was derived solely from the Will, and not from the letter or order of Coffee and wife, directed to the Executor, *504 requesting Mm to convey said lots to Wm. Ruffin, which, of itself, conferred upon him no additional power or authority to make such conveyance; nor was it executed and authenticated according to law, so as to convey, or authorize the conveyance,- of even whatever beneficial interest the wife might have in said lots, under her grandfather’s Will; and can be regarded in no other light than as a mere request in writing that the Executor should exercise the power vested in him in the particular manner, and for the considerations indicated. The deed from William Ruffin and wife to Mrs. Coffee operated to vest in her the legal title to the lands in Panola County, Mississippi; and the deed from James D. Ruffin, the Executor, operated to vest in Mrs.' Cochran, to her sole and separate use, the title to the lot on Exchange street.
The transactions between Coffee and wife, of the one part, and Wm. Ruffin of the other part, of the 22nd of March, 1861, was not, nor was it intended, as a re-cision of the contract of 1859, between Ruffin and John D. Coffee, and a re-sale of the land in Mississippi, to the wife; but it was intended to substitute the wife to the rights of the husband, under that purchase. It was simply a contract, by which Ruffin, in consideration that Mrs. Coffee would cause to be conveyed to him the two town lots, which was supposed to be her property, and estimated at $5,000, in payment of the purchase-money due from Coffee to him for the land; and Coffee would relieve him from liability on his bond, by delivering up the same; that he would convey said lands to Mrs. Coffee, and deliver up the notes given by Coffee, *505 for the purcbase-money; and in consideration that Ruffin would convey said lands to her, Mrs. Coffee agreed to cause said lots to be conveyed to him; and the question, which has been so elaborately and ably argued, is, what effect is to be given this transaction ? To determine which, we must first look to the situation of the parties, and the surrounding circumstances, at, and anterior to, the time of the transaction. John D. Coffee, the husband, was an improvident, unsafe man in business transactions, and perhaps insolvent. Mrs. Coffee was a feme covert, and had but recently attained her majority, having married during infancy; and was entitled, under the Will of her grandfather, to a share of one-third of one moiety of his estate, remaining after the payment of debts — deducting from said moiety certain specific legacies, amounting to $1,500. James D. Ruffin, the uncle of complainants, and the father of Wm. Ruffin, was the Executor of the Will, and under it, the Trustee for complainants, with very wide and comprehensive powers as such; and, up to the date of this transaction between his son, and one of the beneficiaries under the Will, had never returned an inventory of the estate of the testator to the County Court, as it was his manifest duty, as Executor, to have done, so that parties in interest might be advised of the extent thereof. Eor some time before the death of the testator, Wm. Ruffin was his private secretary, and thereby acquired an intimate knowledge of his business and property; and after the qualification of his father, as Executor, was his agent, in the management of the property and transaction of the business of the estate, until December, 1859; and, *506 as such, took charge of the real and personal property belonging to the estate; rented out the realty; received rents; paid debts of the estate, etc. After the termination of his agency, one Horton succeeded him, who continued as such agent, until .about the time of the Federal occupation of Memphis, in 1862. James D. Ruffin himself, who, during all this time, lived in the State of Mississippi, seems to have relied mainly upon these agents for his information touching the business of the estate; and it does not appear that Mrs. Coffee had any knowledge, whatever, at the time of this transaction, of the value of the estate, or in what it consisted, or of the value of her interest under the Will, or of the value of the Mississippi land, or of the lots which she agreed to give in exchange for it. The farm in Mississippi was of the most inferior quality, much worn, and in had condition. It had been sold by Ruffin to Coffee, in 1859, for $6,000, on one, two, three, and four years’ time, without interest; and the weight of the proof is, that at the time of this transaction, it was not worth more than half that sum, if so much, independent of the improvements put upon it by Coffee, subsequently to his purchase; while the lots which Mrs. Coffee agreed to give in exchange for the land were, at the same time, worth from $10,000 to $18,875, as variously estimated by the witnesses; and at least twice the estimated value of the Mississippi farm, and three or four times its real value, exclusive of the improvements placed upon it by Coffee, the husband.
The application to rescind this contract, is based upon the ground, that the same was obtained by fraud, both *507 actual and constructive; that the inadequacy of the consideration is gross and manifest; and that the conduct of the Executor, in attempting to consummate an agreement so unjust and iniquitous, and so highly prejudicial to the interests of Mrs. Coffee — towards whom he occupied a most solemn fiduciary relation — by accepting the order of Coffee and wife; and his subsequent conveyance of one of the lots, for the benefit of his son, was a fraudulent breach of the trust reposed in him, and a gross abuse of the discretionary powers vested in him by the Will.
It is now the well settled doctrine of the Courts of this country, that mere inadequacy of consideration, of itself, unaccompanied by other circumstances — raising a presumption of fraud — unless the inadequacy be so gross and manifest that, in the language of Lord Thurlow, “it is impossible to state it to a man of common sense, without producing an exclamation at the inequality of it,” is not in general a sufficient ground to set aside an executed contract in equity. Where, however, the inadequacy is so manifestly gross, as in the case stated by Lord Thurlow, “the court will infer from that fact alone, there must have been such imposition, or oppression, in the transaction, or such want of common understanding in the party, as to amount to a case of fraud, from which it will not suffer any benefit or advantage to be derived.” Yet, where the inadequacy is not, of itself, so manifestly gross, as to strike the mind with amazement, or to shock the conscience, it may, in connection with suspicious circumstances, and particularly in view of the relations of the parties, as where they stand *508 in a fiduciary relation to one another, be evidence of fraud, and materially assists the Court to the conclusion, that such a case of fraud is established, as demands redress. Hill on Trustees, 152, Note 1, 3rd Am. Ed., and authorities cited; Sugden on Vendors, 193; Osgood vs. Franklin, 2 John. Ch. R., 1.; Wright vs. Wilson et al., 2 Yer., 294. In the latter case, the rule laid down by Lord Chancellor Thurlow, by which such inadequacy of consideration as may be sufficient to authorize a Court of Chancery to set aside an executed contract is to be ascertained, is, by reference being had to cases already determined, was recognized; and, acting upon this rule, Judge Whyte, in delivering the opinion of the Court, refers to the case of Herne vs. Meers, 1 Vern, 465; in which it was held that “the bargain made by Sir Thomas Meers with Cox, Jr., was not fairly obtained, in respect of the circumstance young Cox was in, but ought in conscience to be made void; the premises by him purchased, being more than double the value of the money paid by him;” also, to the case of Heathcote vs. Paignon, 2 B. C. C., 167, in which the Master of the Rolls, afterwards Lord Kenyon, set the purchase of an annuity aside, upon the ground that the price given was near two-thirds the real value of the annuity, and one-fifth below what appeared the market price; and, upon an appeal to the Lord Chancellor, the decree was affirmed; In setting aside contracts, on account of the inadequacy of the consideration, the Court proceeds on the fraud, evidenced by the gross inequality of the contract.
If this case rested alone upon the grossly inadequate consideration, paid by Wm. Ruffin to Mrs. Coffee, for the *509 town lots, and the parties bad not by subsequent dealings placed it beyond our power to place tbe parties in statu quo, we would feel constrained to rescind the contract; but the right of Mrs. Coffee to a recision of the contract, does not rest alone upon this evidence of fraud.
“Whenever, from the peculiar relations or connection existing between the parties, considerable authority or influence exists on one side, and a corresponding reliance and confidence is placed on .the other, a party will not be suffered to abuse this authority or influence, by extracting from it any advantage to himself. But the Court will look into transactions between persons in these relative situations, with extreme jealousy, and if it find the slightest trace of undue influence used, or unfair advantage taken, will interpose and give redress. Indeed, in some of these cases, as for instance, in dealings between guardian and ward, trustees and cestuis que trust, or attorney and client, the transaction is, in itself, considered so suspicious, owing to the near connection between the parties, as to throw the proof upon the person who seeks to support it, to show that he has taken no advantage of his influence or knowledge, but has put the other party on his guard, bringing every thing to his knowledge which he himself knew:” Hill on Trustees, 156. As early as the case of Holt vs. Holt, in the 22 Car. II, the principle was fully recognized, that a trustee cannot act for his own benefit, on a subject connected with the trust: 1st Ch. Cas. 190; and, so far as we are advised, the principle has ever since been, not only substantially adhered to, but rigidly enforced.
*510 The authorities upon this point were very thoroughly reviewed by the Chancellor, in the case of Davoue vs. Fanning, 2 Johnson’s Ch. Rep., 252, in which it was held: “If a trustee or person acting for others, sells the trust estate and becomes himself interested in the purchase, cestuis que trust are entitled, as of course, to have the purchase set aside, and the property re-exposed to sale, under the direction of the Court; and it makes no difference in the application of the rule, that the sale was at public auction, and for a fair price, and that the Executor did not purchase for himself, but a third person, by previous arrangement, became the purchaser, to hold in trust for the separate use of the wife of the Executor, who was one of the cestui que trusts, and had an interest in the land, under the Will of the testator.” The Chancellor says:
“However innocent the purchaser may be in the given case, it is poisonous in its consequences. The cestui que trust is not bound to prove, nor is the Court bound to judge, that the trustee has made a bargain advantageous to himself. The fact may be so, and yet, the party not have it in his power distinctly and clearly to show it. There may be fraud, as Lord Hardwicke observed, and the party not able to prove it. It is to guard against this uncertainty and hazard of abuse, and to remove the trustee from temptation, that the rule does and will permit the cestui que trust to come at his ’own option, and without showing actual injury, and insist upon the experiment of another sale. This is a remedy which goes deep, and touches the very root of the evil.”
*511 This question came before the Supreme Court of the United States, in the case of Michaud vs. Girod, 4 Howard, 503. In that case, after stating the rule as laid down by Sir Edward Sugden, “that trustees, unless they are nominally such, to preserve contingent remainders, agents, commissioners of bankrupts, assignees of bankrupts, solicitors to the commissioners, auctioneers, creditors who have been consulted as to the mode of sale, or any person, who, by their connection with any other person, or by being employed or concerned, in his affairs, have acquired a knowledge of his property, are incapable of purchasing such property themselves, except under the restraints which will be shortly mentioned; for if persons having a confidential character were permitted to avail themselves of any knowledge acquired in that capacity, they might be induced to conceal their information, and not to exercise it for the benefit of the persons relying upon their integrity:” 2 Surg. on Vendors, 109, London Ed. Judge Wayne in delivering the very well considered opinion of the Court, in discussing the reason upon which the rule is founded, says: “ The general rule stands upon our great moral obligation to refrain from placing ourselves in relations which, ordinarily, excite a conflict between self-interest and integrity. It restrains all agents, public and private; but the value of the prohibition is most felt, and its application is more frequent, in the private relations, in which the vendor and purchaser may stand towards each other. The disability to purchase is a consequence of that relation between them, which imposes on the one a duty to protect the interest of *512 the other, from the faithful discharge of which duty his own personal interest may withdraw him. In this conflict of interest, the law wisely interposes; it acts not on the possibility, that in some cases, the sense of that duty may prevail over the motives of self-interest, but it provides against the probability, in many cases, and the danger in all cases, that the dictates of self-interest will exercise a predominant influence, and supersede that of duty.”
In the case of Prevost vs. Gratz, 6 Wheat., 481, and the case of Ringo vs. Binns, 10 Pet., 269, it was held, that, if an agent discovers a defect in the title of his principal, to land, he cannot misuse it to acquire a title for himself; and if he does that, he will be held as a trustee holding for his principal.
See, also, the case of Oliver vs. Piatt, 3 How., 323. In the case of Church vs. Marine Insurance Company, 1 Mason, 341, it was held, that an agent or trustee, cannot, directly or indirectly, become the purchaser of the trust property, which is confided to his care; and this case was cited, approvingly, in the case of Michaud vs. Girod, before cited and in which the Court further say: “We scarcely need add, that a purchase by a trustee, of his cestui que trust, sui juris, provided it is deliberately agreed, or understood between them, that the relation shall be considered as dissolved, and there is a clear contract, ascertained to be such, after a jealr ous and scrupulous examination of all the circumstances, and it is clear that the cestui que trust intended that the trustee should buy, and there is no fraud, no concealment, and no advantage taken by the trustee of in *513 formation acquired by Mm as Trustee, will be sustained in a Court of Equity. But it is difficult to make out such a case, where the exception is taken, especially where there is any inadequacy of price, or any inequality in the bargain;” and in support of this proposition, the learned Judge cites 9 Vesey, 246; 2 Bro. Ch. R., 400; 6 Vesey, 277; 3 Vesey, 740; 5 Vesey, 678; and 2 Atk., 59, and then adds, “and therefore, if a Trustee, though strictly honest, should buy for himself an estate from his cestui que trust, and then should sell it for more; according to the rules of a Court of Equity, from general policy, and not from any peculiar imputation of fraud, he would be held still to remain a Trustee, to all intents and purposes, and not be permitted to sell to or for himself:” 1 Story’s Eq., 317; 2 Bro. Ch. R., 400; 2 Cox, 320-327.
In the case of Perkins vs. McGavock, 3 Haywood, 265, the rule was holden to be: that a Trustee cannot act for himself; that whoever undertakes to act for another in any matter, shall not, in the same matter, act for himself; and it was further holden, to be no objection to the application of this rule, that the Trustee, or agent, has made no advantage by such act; for the reason that equity disallows the measure, upon general principle, without reference to advantage or unfairness.
In the case of Armstrong vs. Campbell, 3 Yer., 201, the case of Davoue vs. Fanning, 2 Johns. Ch. R. 255, was referred to, and the principles announced in that case were fully recognized as conclusively stated; and in the cases of Wade vs. Harper, 3 Yer., 383, Wright vs. Wilson, 2 Yer., 294, and of Chester vs. Gruer, 5 *514 Hum., it was Holden that the rule, as stated in Davoue vs. Fanning, 2 Johns. Ch. R., applied to a creditor for whose benefit the debtor has made a deed of trust, in which the right to say when, and upon what terms, the Trustee shall sell, is conferred upon the creditor.
But in the cases of Hadley vs. Latimer, 3 Yer., 537, citing Jeremy’s Eq., 393, and of Lyons vs. Jones, 6 Hum., 533; and in the still later case of Marshall vs. Stephens, 8 Hum., 159, it has been held that "where the cestui que trust is capable of talcing a part in the transaction, the Trustee may make a bargain with him, or purchase under his authority, or with his sanction.”
“The most the Court will do, in such a case, is to watch the transaction with jealousy. But, however jealous the Court may be, where the relation is established, and however disposed to set aside á contract so suspicious in the eye of the law; still, where the agent, or Trustee, can prove to the satisfaction of the Court, after a scrupulous examination of all the circumstances, that there was no fraud, no concealment, no advantage taken, the Court will not interpose.” “To do so,” says the Court, in the case of Hadley vs. Latimer, 3 Yer., “would be to assume to judge and act for other men, where the conscience of no one is affected.”
So, we think, it may now be regarded as the settled doctrine of the Courts of Chancery in Tennessee, that, as a general proposition, Trustees, unless they are only nominally such, agents, or any persons, who, by their connection with any other person, or by being employed or concerned in his affairs, have acquired a knowledge of his property, are incapable, themselves, of pur *515 chasing the trust property, or the property over which they may have control as trustees, or agents, or in right of any fiduciary or confidential relations whatever from the cestui que trusts, or beneficiary, or principal. But if the party seeking to maintain such transaction, can show, by clear and satisfactory proof, that the same was, in all respects, fair and entirely free from all imputation of fraud, or unfair advantage; that there was no concealment, and no advantage taken by the Trustee, or such person standing in such fiduciary or confidential relation, of information or knowledge acquired by him»as such, and that there was no inadequacy of consideration, a Court of Equity will not interpose to set it aside.
The fact, that the relation may have terminated before the date of the transaction, cannot affect or change the rule; but it is a fact, to be taken into consideration in the investigation of the question, touching the alleged fairness of the transaction, and may be entitled to much or little weight — depending upon the particular circumstances of the case.
The question is, not whether the rule has been applied heretofore to a state of facts similar to those under investigation; but the point to be determined, is, does the case fall within the principles and reasons of the rule ? and, if it does, the rule will be applied; and the doing so does not involve the necessity of extending the rule, as it is sometimes erroneously called, but it is merely the application of the rule to a different state of facts.
*516 Now, applying these principles to the case under consideration, we think there can be no doubt — other questions out of the way — but that complainants are entitled to a recision of the contract of the 22d of March, 1861. It seems to us the case falls clearly within the reasons of the rule.
It is true, as a general rule, that a contract will not be rescinded when it is out of the power of the Court to place the parties in statu quo; but this rule is subject to some qualification, and applies only to such cases as, in which, by such recision, one party would be enabled to obtain a fraudulent advantage of another; and not to cases, where one party has, by fraud, obtained an unconscionable advantage of another, and such recision would manifestly be in furtherance of justice, and the Court has it still in its power to reach and enforce the equities of the parties arising upon the recision.
The Court, in this case, has no power to disturb the rights of Thompson, the purchaser from Coffee and wife, in the Mississippi lands; nor has it the power to disturb the rights of Mrs. Cochran to the lot on Exchange street, under the deed from the Executor; and to this extent the contract between Coffee and wife and Vm. Ruffin, of the 22d of March, 1861, will be maintained; but it does not follow, by any means, that, therefore, Mrs. Coffee is entitled to no equitable relief as. against her contract, obtained by the fraud of ¥m. Ruffin, when the Court has it in its power to administer full and complete equity in the case. The fact, that *517 certain general discretionary powers were, by the Will, conferred upon the Executor, under which he had the power to dispose of the property as he thought best, can make no difference as to these rules, or the rights of the parties, in the view we have taken of the case; hence we do not deem it necessary to enter upon a discussion of the question as to how far a Trustee may be controlled in the exercise of discretionary powers with which he has been clothed, further than to announce that a Court of Chancery will interpose and prevent such a fraudulent exercise of such power, as will amount to a breach of the trust and confidence reposed in him. It can make no difference what latitude of discretion may be given a Trustee, or any . one occupying a fiduciary or confidential relation; he is bound to exercise such discretion in good faith, and may be restrained from its fraudulent or abusive exercise. James D. Ruffin was not only clothed with large powers, and a latitudinous discretion given him in the exercise of these powers; but he took upon himself certain solemn and responsible duties, and those duties cannot be avoided or lessened, or relieved against, by the fact that a wide field of discretion was given him, in the manner, and as to the time, of their performance. It was his duty to have protected the interests of the cestui que trust; and to have defeated every attempt to sacrifice her interests; and, in this case, it was his duty to have known the value of the property which she was about giving in exchange, and the value of the property she was acquiring ; and, knowing the facts, it was his duty to have withholden his assent from the agreement; and conse *518 quently, by giving bis assent to the agreement, and attempting to consummate it, he was guilty of a fraudulent breach of trust, and will be restrained from inflicting further injury or wrong upon the cestui que trust, by conveying the lot on Lauderdale street.
It is, however, insisted that the endorsement upon the back of the order requesting him to convey the lots in question, was an exercise of the power of sale given him by the Will, and was, of itself, a contract of sale, such as could be set up and enforced in a Court of Chancery. The principle contended for may be, and probably is, correct; but is entirely inapplicable to this case; and is in direct conflict with the principles already stated, as governing transactions of this character. At most, it was simply an undertaking, on his part, to comply with the terms of the request, upon the conditions stated therein. Treating it, then, as such-agreement, merely, a Court of Chancery will restrain him in the execution of such agreement; but treating it as a contract of sale, entered into between the Trustee and his agent, it clearly falls within the rule already laid down, and would, therefore, be subject to recision.
Now, what are the equities, as between these parties? As before shown, the contract was fraudulent and unconscionable upon the part of Wm. Ruffin, and highly prejudicial to Mrs. Coffee. By its terms, the original contract between Wm. Ruffin and John D. Coffee was rescinded; and, in pursuance thereof, Ruffin has conveyed the land to Mrs. Coffee; and Wm. Ruffin has sold and received the purchase money for one of the lots, and has procured the title thereto to be vested in the *519 purchaser; and Mrs. Coffee has sold the land conveyed to her by Ruffin. Mrs. Coffee is, therefore, in equity hound to account to ¥m. Ruffin for the fair value of the lands, at the time of the transaction in 1861, deducting the value of improvements placed upon the farm by her husband; and Ruffin will be charged with the fair value of the Exchange street lot; at the same time, with the rents, if any have accrued to him, from the Lauderdale street lot; and if the value of the land exceeded that of the Exchange street lot, at the time, Ruffin is entitled to a decree for the excess, with interest; and after deducting the amount of rents accruing to him from the Lauderdale street lot, the balance will be declared a lien upon the Lauderdale street lot; and if the value of the Exchange street lot should exceed the value of the land, Mrs-. Coffee will be entitled to a decree against Ruffin for the excess. And in the distribution of the estate of the testator, Mrs. Coffee will be charged with the value of the Exchange street lot, in February, 1861, with interest,' as an advancement made at that time by the Executor.
The Master, in obedience to the decree of the Chancellor, has proceeded to take and state an account between the parties, and has made report thereof. To this report both parties have filed various exceptions. Complainant’s first exception is to the allowance to the Executor, of a credit for interest, at the rate of ten per cent, on $8.000 of borrowed money.
It appears this money was borrowed by the Executor in good faith, to pay the debts of the estate, in order to save the real estate, and otherwise to protect *520 the interest of the estate, at the rate of fifteen per cent, per annum.
Under the discretion given him by the Will, he clearly had the right, if he deemed it necessary, to borrow the money, even at usurious interest, and to charge the estate with the same. In view of the discretion conferred upon him by the Will, he was not bound by the strict rules, touching this question, applicable to Executors generally. But the proof shows this debt was paid by the Executor at the end of six months. He is, therefore, entitled to a credit of six months’ interest, at the rate of fifteen per cent, per annum, on the sum borrowed.
Complainant’s second exception, is to the allowance to the Executor of a credit of $2,000, paid upon an open account to the Gas Company. Although the transaction upon which this payment was based, is, to say the least of it, rather remarkable and unsatisfactory; still the proof, if the witnesses are to be believed, establishes the fact of the indebtedness, and also the fact of the payment of the money by the Executor, and we do not feel authorized, by anything in this record, to discredit the witnesses. We are unable to perceive upon what ground the Secretary of the Gas Company was an incompetent witness to prove the indebtedness, and the payment by the Executor.
In view of the fact, that the Executor was himself entitled, under the Will, to one-half the estate remaining, after the payment of debts, it is hardly probable that he would have applied the assets of the estate to the payment of this account, unless he had believed it was justly due and owing.
*521 The decree of the Chancellor as to this exception, will he affirmed.
Complainant’s third exception, is to the allowance to the Executor of a credit for the amount of certain notes of the testator, which, it is alleged, were based upon a gaming consideration; and which, it is insisted, he paid with a knowledge of that fact. Although the proof tends strongly to show, these notes were based upon a gaming consideration, it wholly fails to show that the Executor had any knowledge of the fact at the time of payment.
This exception was, therefore, properly disallowed.
Various exceptions have been filed, touching the question of rents, etc., which we do not deem it necessary, here, specifically to state. We will content ourselves by a simple announcement of our conclusions, and the principles by which these exceptions must be determined.
It was error to charge the Executor with rents of the lot on Exchange street, after the 22d of March, 1861, the date of the sale thereof to Wm. Ruffin. He will be charged with all the rents which were, or ought to have been, collected by him; but he cannot be compelled to account for such as was lost by the insolvency of the tenants, and without the fault of the Executor, or in consequence of the casualties of war. The mere fact, however, that tenants occupying the premises, refused to attorn to the Executor or his agent, alleging as an excuse, that they were paying rents to the Grovernment, -is not of itself sufficient to relieve him from liability. The allegation may have been false; or, if true, the fact may not have released *522 them from their liability to the Executor. If any seizure, in fact, of the premises had been made by the Government, such seizure may have been unlawful. The lawful seizure of the property, by the authorized officers of the Government, is one thing, whilst its unauthorized occupation or appropriation, is another and very different proposition.
The Executor is chargeable with the full value of the rents for the property, which he took possession of, listed for taxes, and claimed and occupied as his own, in 1861; and in ascertaining the same, regard must be had to the disturbed condition of the country. The question is, could such property have been rented in Memphis during these years? and, if so, for what sum? His possession, holding and claiming the property as his own, although innocent in intention, as it probably was, was, nevertheless, in fact, a breach of his trust— the estate never having been divided. The result is, he must be charged with the reasonable rents accruing afterwards.
It was error to charge the estate with interest upon the special legacies, from the date of their payment by the Executor. The payment of such legacies created no charges or liability against the estate, in favor of the Executor.
Until the estate is divided, as contemplated by the Will, the entire assets in the hands of the Executor constitute a general fund belonging to the estate; and it was error to charge him with only one-half of moneys received by him, and credit him with one-half ■of his disbursements, upon the ground, he will be en *523 titled to one moiety of the estate, remaining after the payment of the debts. He should he charged with the full amount of his receipts, and credited with, the full amount of his disbursements; and before division, the estate in gross must he charged with all the expenses necessarily incident to the administration. The exception of the Executor, upon the grounds, the Master failed to allow him interest on the amount found due him by his settlement with the Clerk of the County Court, in 1862, is not well taken. In such cases, the allowance of interest is purely a matter of discretion, and the facts disclosed, as touching that settlement, are not such as to invoke the favorable exercise of that discretion.
While we do not feel warranted in saying the Executor has been guilty of intentional fraud; it is, nevertheless, apparent, that, owing to the manner in which he has discharged the trusts of the Will, and kept his accounts, he is, himself, unable to give any reliable and satisfactory explanation of many of the transactions. He has never made any inventory of the estate which came to his hands, as it was his duty .to have done. Nor did he make any settlement of his administration,' so far as appears from this record, until near five years after his qualification. And even then, he failed to charge himself with rents of 1860 and 1861, and charged the estate with a large amount of usurious interest, when there was no pretext that he had ever paid the same.
Owing to his failure to discharge his duties as Executor and Trustee, many of the transactions which have *524 occurred in the course of his administration, are involved in so much mystery, that it is utterly impossible to ascertain, with any certainty, the truth in reference to them.
This is but another commentary upon the shamefully negligent and grossly careless manner in which Trustees so frequently discharge the trusts confided to their charge. Under such circumstances, he cannot be allowed this exception; and for similar reasons, his exception to the report, because the Master allowed him only $2,000, as compensation for his services as Executor, will be disallowed. Trustees, who discharge their duties as such, with promptness and fidelity, are entitled to a liberal compensation, but certainly not otherwise. Our only doubt is, whether, under the circumstances of this case, he ought to have been allowed any compensation for his services as Executor; but, as both the Master and the Chancellor have allowed it, we will not disturb it; and inasmuch as the Chancellor has allowed him an additional compensation of five per cent, on the amount of rents collected by him, the same will not be disturbed; but it must be confined to rents with which he has voluntarily charged himself.
The decree of the Chancellor will be modified, as indicated in this opinion, and in all else affirmed.