**Eleanor B. KRUG, et al.,
Plaintiffs–Appellees,**

**v.**

**Gregory C. KRUG, et al., Defendants–
Appellants.**

Court of Appeals of Tennessee,
Eastern Section.

Jan. 24, 1992.

Permission to Appeal Denied
by Supreme Court
June 22, 1992.

A. Philip Lomonaco, Knoxville, for appellants.

Paul T. Coleman and Stephen E. Roth with Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Knoxville, for appellees.

## OPINION

SANDERS, Presiding Judge, Eastern Section.

The genesis of this case is found in three trust documents created by George Charles Krug, who was the husband of the Plaintiff–Appellee, Eleanor Krug, and father of the Defendant–Appellant, Gregory Krug (Greg). In 1987 George Krug executed the George Charles Krug Revocable Trust (GCK Trust). At that time he had a wife of over 50 years and three children, Catherine, Carol and Gregory. Upon George's death in 1988, the revocable trust was divided into three irrevocable trusts, desig-

nated as "Carol's Trust," the "Krug Family Trust," and the "Q–Tip Trust." Carol's Trust is not in dispute.

The purpose of the Krug Family Trust is stated as follows: "The Trustee shall pay to or apply for the benefit of Trustor's wife, Eleanor Barron Krug ("Eleanor"), so much of the income, and principal if required, of the Krug Family Trust as shall be necessary to provide for her reasonable health, maintenance and support; ...."

The purpose of the Q–Tip Trust is similar, providing: "The Trustee shall pay to or apply for the benefit of Eleanor, in quarter annual or more frequent installments, all the net income of the Q–Tip Trust and as much of the principal of the Q–Tip Trust as the Trustee deems necessary to provide for Eleanor's reasonable health, maintenance and support; ...." The Q–Tip Trust owns the Jones Bend property, which was the family home.

Under both the Family Trust and the Q–Tip Trust the remainders will be distributed in equal shares to Greg and Catherine, if living. If either of them is not living, then to their issue. If both are deceased before Eleanor, and are not survived by issue, the remainders go to Carol's Trust.

All three trusts were to be managed by co-trustees. The appointment of trustees forms the principal issues on this appeal. Article III, titled "Successor Trustee", in pertinent part, provides: "In the event George Charles Krug should become incompetent or otherwise unable or unwilling to serve as Trustee, Gregory shall serve as Co–Trustee with Eleanor, or at Eleanor's option, as Co–Trustees or Trustee without Eleanor. Eleanor shall have the right, in her sole discretion at any time, to remove Gregory and replace the same with Valley Fidelity Bank & Trust Co. of Knoxville, Tennessee ("Valley Fidelity"). Eleanor shall have the right, in her sole discretion at any time, to remove Valley Fidelity as Co–Trustee or sole Trustee, and replace it with Gregory or sole Trustee. Eleanor shall also have the right, in her sole discretion at any time, to reappoint herself as Co–Trustee at any time after she shall have resigned as a Co–Trustee; provided that either Valley Fidelity or Gregory also serve as Co–Trustee with Eleanor."

The trustee's/trustees' powers are vast and, as relevant to this controversy, are enumerated as follows: "(5) to loan, ... invest ... the Trust Estate or any part thereof; (10) to borrow money for any trust purpose; ... provided, however, that money shall not be borrowed to purchase assets, nor shall assets be purchased subject to liabilities...." Article IV(B) authorizes the trustee(s) to retain any property already in the trusts. It further provides that "Eleanor shall, in her sole discretion, have the power to direct the Trustee to sell any non-income producing property in such trust."

Upon George's death, Greg amended the partnership agreement previously made between Greg and his father. The partnership, known as Krug Investments, had as partners Mrs. Eleanor Krug, the Carol Krug Trust, the Krug Family Trust, the Q–Tip Trust, Eleanor Krug's 1985 Revocable Trust, and the estate of George Krug. The agreement named "Gregory C. Krug, Eleanor C. Krug (the 'Co–Managing Partners') ...." The purpose of the Partnership (as stated in the agreement) "is to accept contributions from the partners and invest these funds as the Co–Managing partners deem appropriate." The partnership was to dissolve on "July 1, 2008; the date the Partnership ceases to have any assets; or any other date as agreed upon by all of the Partners." The partnership agreement included an arbitration clause which provided: "Any controversy or claim arising out of or relating to this Agreement or a breach thereof shall be settled by arbitration...."

In January, 1990, Mrs. Krug decided to move her residence from Louisville in Blount County to West Knoxville. Her residence in Blount County was in the Jones Bend property which was an asset of the Q–Tip Trust. She informed her son, Greg, of her decision and asked him whether she had to sell the Jones Bend residence before buying a condominium in West Knoxville. She testified he told her she

could move right away and there was $500,000 available to purchase the condo.

Greg felt the condominium she chose, which had 3500 square feet and contained four bedrooms, was overpriced and too big for her needs. He testified Mrs. Krug's counsel threatened to remove him as a co-trustee if he did not acquiesce in the purchase of the condo. Greg did ultimately approve the purchase.

In February, 1990, Greg refused to permit the Q–Tip Trust to purchase the condominium because it would have to borrow funds with which to make the purchase. The Trust does not permit a trust to borrow money to buy an asset or buy an asset subject to an encumbrance. Greg suggested that Eleanor's revocable trust purchase the condominium. The trust, however, had only $140,000 in it, so Greg further suggested that one trust lend another trust the money to buy the condominium.

On February 9, 1990, without Greg's knowledge, Mrs. Krug went to Morgan Keegan & Co. and withdrew $250,000 from the partnership account. She testified she did this based upon Greg's statement that there was $500,000 available for her to purchase the condominium. These funds were later returned to the account. The day after the funds were returned, Mrs. Krug removed Gregory as co-trustee and replaced him with Valley Fidelity. The condominium was acquired on March 21, 1990, and Mrs. Krug then executed the reinstatement document, reinstating Greg as co-trustee.

On April 6, 1990, after Mrs. Krug had moved her personal possessions from the Jones Bend property, she asked her insurance agent to cancel the fire and extended coverage insurance protection for that property. Upon learning it had been canceled, Greg had it reinstated. An appraisal of the Jones Bend property was $275,000. Greg offered to buy the house for $275,000 but Mrs. Krug offered to sell it to him for $375,000. He refused to purchase at that price.

Mrs. Krug again terminated Greg as co-trustee on May 18, 1990, but he refused to be terminated. On May 25, Morgan Keegan & Co. informed Greg the partnership account was "frozen" until ownership of the funds could be determined to its satisfaction. Valley Fidelity was notified of Morgan Keegan's actions on that same day.

On June 1 Mrs. Krug, individually and as a co-trustee, filed a complaint against Greg, Krug Investments, and Morgan Keegan & Co. The complaint sought a declaratory judgment that Mrs. Krug was empowered to remove Greg as co-trustee of the Krug Trusts and replace him with Valley Fidelity Bank. Mrs. Krug also requested, and received, a temporary restraining order against Greg and Morgan Keegan & Co. to freeze the partnership's accounts and assets. She also requested that the partnership be dissolved under T.C.A. § 61–1–130(1)(B) and alleged that irreconcilable differences made it impossible to continue the partnership.

Greg filed a counter complaint asking for removal of Mrs. Krug and Valley Fidelity as Trustees. He asserted Mrs. Krug was not competent to remove him and she acted in bad faith and improper motive when she did so. He also asked the court to dismiss the restraining order and the dissolution requests, alleging lack of jurisdiction over Krug Investments and asserting that Krug Investments is a partnership for a set term, with an arbitration clause, and any dispute regarding the partnership is subject to arbitration. He also asked for a declaratory judgment declaring him to be the sole trustee of the trusts. He asked for removal of Mrs. Krug and Valley Fidelity for breaches of their fiduciary duty in failing to administer the trust property properly and attempting to remove funds from the trust unilaterally. He also requested the court to enjoin Mrs. Krug and Valley Fidelity from disposing of assets and making withdrawals or dealing further with the trusts' assets. He requested damages for breach of contract for refusal to sell to him the Jones Bend property at fair appraisal value. Greg also sought Rule 11, T.R.C.P., sanctions against the Appellees for their seeking a temporary restraining order

against him, saying there was no just cause for that request.

There were numerous other motions and filings prior to the trial of the case but, upon the trial of the case, the court held Mrs. Krug had the authority to remove Greg and replace him with Valley Fidelity as co-trustee. The court refused to remove either Mrs. Krug or Valley Fidelity. He further ordered the dissolution of the partnership.

Greg made a post-trial motion for a stay of the judgment with regard to dissolution of the partnership. That motion was denied and he has appealed, presenting the following issues for review: (1) "The Court applied an improper fiduciary standard to Mrs. Krug and erred by allowing her to arbitrarily discharge Mr. Krug as Co–Trustee of the various trusts"; (2) "The Court should have removed Mrs. Krug and Valley Fidelity Bank as Trustees, either for cause or under the Maydwell Doctrine"; (3) "The Court erred when it dissolved Krug Investments Partnership. The issue of Dissolution should have been sent to Arbitration"; and (4) "The Court erred in not imposing Rule 11 Sanctions against the Plaintiffs for obtaining a Temporary Restraining Order against the Defendant without proper cause."

The Appellant first contends Mrs. Krug acted arbitrarily in discharging him as co-trustee and that even a trustee with "sole discretion" is required to exercise that discretion in good faith. The Appellee, however, contends the good faith requirement was waived in the trust agreement. The trial court found the good faith requirement "probably does not apply to [Mrs. Krug]."

■ While Mrs. Krug was authorized to remove a co-trustee and appoint another in his stead "in her sole discretion," she is required to exercise that authority in good faith. "Even where the trustee has discretion, however, the court will not permit him to abuse the discretion. This ordinarily means that so long as he acts not only in good faith and from proper motives, ... the court will not interfere." Scott on Trusts (Third Ed.), § 187, pg. 1501. *See*

*also* Rest.2d Trusts § 187, comment g, pg. 404 (court will control the trustee if he is acting from an improper even though not dishonest motive). Tennessee follows this control of discretionary powers rule. Our supreme court, in *Coffee v. Ruffin,* 44 Tenn. 487 (1867) stated in dicta: "It can make no difference what latitude of discretion may be given a Trustee, or any one occupying a fiduciary or confidential relation; he is bound to exercise such discretion in good faith...." *Coffee,* at 517 (quoted in *Cansler v. Unknown Heirs of Chairs,* 35 Tenn.App. 631, 250 S.W.2d 579, 581 (1951).

■ The good faith requirement may be waived by the words of the trust but the words are interpreted narrowly. Words found to waive the reasonableness standard are "absolute" or "unlimited" or "uncontrolled" discretion. Rest.2d Trust § 187, comment j, pg. 408. To the contrary, the words "in sole discretion" do not waive the good faith requirement. *Stiller v. State,* 516 S.W.2d 617, 620 (Tenn.1974). Although a criminal case, the supreme court relied upon trust cases to interpret the phrase, and adopted their rationales. *Id.* at 621. "In a case decided under New Jersey law, where a settlor of a trust designated the trustee as *sole* judge of the needs of a beneficiary, the court held that this did not obviate the necessity of exercising his judgment in an honest manner or relieve him of the duty to act in good faith and with a proper motive. (Citation omitted.) In *Lucas v. Lucas,* 365 S.W.2d 372, another trust case, the court held that a provision authorizing trustee to make payments in their *sole discretion* did not enable the trustee to exercise his discretion in an arbitrary manner." *Id.* at 620. The phrase "in her sole discretion" does not waive the good faith requirement placed upon acts of discretion, but merely limits who makes the decision.

■ Coercing a co-trustee to act outside his good faith or best judgment regarding the trust management by threatening his removal would probably rise to bad faith or threatening to act from an improper motive. However, under the facts of the case

at bar, we do not believe Mrs. Krug acted in bad faith when she removed her son as co-trustee either time. Greg testified that Mr. Wilson, Mrs. Krug's attorney, called him and threatened his removal if he did not agree to the condominium purchase, but a letter from Mr. Wilson to Mr. Krug denied that threat. Mr. Krug then testified, "I can only presume that I was fired as a trustee because I defended my father's trust from someone trying to make an unauthorized withdrawal from it." On the other hand, Mrs. Krug testified she removed her son because he did not communicate with her as to his investment or disbursal of income decisions; he did not consult her on his maintaining the Jones Bend property or on leasing that property. She testified, "He was making me feel very inadequate." From these feelings, she began to lose confidence in her son. Although Greg's honesty and ability were never questioned and Mrs. Krug's inability to make business decisions is clear, Mrs. Krug could properly replace a co-trustee who would not communicate with her. The trust agreement provided for a new co-trustee and there is every indication the new co-trustee does communicate with her.

Greg claims his reinstatement as a co-trustee was fraudulent because Mrs. Krug intended to fire him once the condominium was bought. If that, indeed, is the case, why did Mrs. Krug reinstate him on the condominium's closing date and retain him as co-trustee for nearly two more months? We believe this argument is without merit.

Greg also claims his second termination was threatened in order to force him to buy the Jones Bend property for $100,000 more than its appraised value. He testified, "All I know is that when I refused to pay three seventy-five, I got fired, okay?" The letters between Mr. Wilson and Greg, however, state that Greg had accepted an offer to buy the Jones Bend property for $466,303. Whether an offer and acceptance were made for $466,303 is not before this court but, from the record, it appears it was the continuous communication problems, aggravated by the sale of the Jones Bend property, that led to Greg's second termination.

Because we fail to find bad faith on the part of Mrs. Krug when she terminated Greg as co-trustee, we affirm the trial court on this issue.

The second issue is multifaceted. Greg contends his mother and Valley Fidelity should be removed for cause under T.C.A. § 35-1-106 or the *Maydwell* doctrine.

■ A trial court's decision concerning the removal of a trustee will be reversed only for an abuse of discretion. 76 Am. Jur.2d Trusts § 131, pg. 373; Scott on Trusts § 107, pg. 840-41.

■ The *Maydwell* doctrine, set out in *Maydwell v. Maydwell*, 135 Tenn. 1, 185 S.W. 712 (1916) provides as follows: "When the duties of the trustee are such as to necessitate personal contact and conference between the trustee and the *cestui que trust*, and the relations existing between the parties have become so acrimonious as to render personal intercourse impossible, a change of trustees should be made." 135 Tenn. at 4-5, 185 S.W. 712. In *Maydwell*, the trustee mother was instructed to apply the income from the trust in her discretion for her daughter, the beneficiary. The animosity between the daughter and the mother grew so bad that the daughter sought to remove her mother as trustee.

The chancellor correctly distinguished *Maydwell* from the case at bar. Here Greg is merely a remainder beneficiary, not an income beneficiary who is subject to a trustee's discretion in providing for his welfare. There is no necessity of communication and personal contact between the trustee and the remainderman. Ironically, it is Mrs. Krug who could rely on *Maydwell* to remove her uncommunicative trustee/son, but the argument was unnecessary since she has the power to remove him.

■ In support of removing Mrs. Krug for "just cause" under T.C.A. § 35-1-106, Greg points to her (1) removing the insurance on the Jones Bend property without informing him or Valley Fidelity, (2) trying to remove $250,000 out of Krug Investments without informing anyone, and (3)

her inability to properly manage the trusts. The settlor of the trusts, however, was aware of his wife's scant business acumen but, apparently, wanted her to be a trustee and, as such, have knowledge of their management and have a say in their disbursals. To compensate for her inability, the settlor required that either Greg or Valley Fidelity be co-trustee.

Mrs. Krug made the attempted removal of trust funds from Krug Investments on her attorney's advice and because Greg was so uncommunicative. Indeed, this action is further evidence of how badly the communication between the two co-trustees had deteriorated. Her removal for this isolated incident is not warranted. The funds of the trusts and the partnership are placed in accounts which adequately safeguard against their removal by Mrs. Krug alone.

While her unilateral removal of homeowner's insurance was improper, we do not believe the trial court abused its discretion by refusing to remove Mrs. Krug under the circumstances of this case.

Removal of Valley Fidelity is more complex. Greg contends Valley Fidelity has failed as co-trustee by appointing a trust officer to the trusts who is unfamiliar with real estate trusts. Because the trust officer, Mr. Robert Killefer, was unfamiliar with real estate trusts, the bank did not (1) make sure the Jones Bend house was insured, (2) inspect the property within a reasonable time, (3) inquire whether real estate taxes or mortgage payments were owed, (4) sell the house, or (5) pay the maintenance costs on the house before delivering all rental income directly to Mrs. Krug. Further, Mr. Killefer admitted that most of his actions with regard to the trusts were upon the advice of counsel. The bank's counsel is the law firm in which Mr. Wilson is a partner. Mr. Wilson is Mrs. Krug's counsel. Greg contends that, because of this relationship and advice, Mrs. Krug's counsel is de facto co-trustee and is not impartial.

There is a multitude of problems if, in fact, Mr. Wilson or his law firm was directing Valley Fidelity in its duties. First, a sole trustee cannot be a sole beneficiary.

Scott on Trusts § 115, pg. 884; 76 Am. Jur.2d § 36, pg. 283. If Mr. Wilson, who must act with his client's interests in mind, is acting as the co-trustee, there is a question whether the trustee and beneficiary are not then one and the same.

Second, a bank or trust company is ordinarily held to a higher standard of care and skill than that which is required by individual trustees. Scott on Trusts § 227.2. "Where [the trustee] has special or professional knowledge or skill, he ordinarily is under a duty to exercise such knowledge and skill...." 76 Am.Jur.2d § 329. If Valley Fidelity cannot manage the three trusts because they involve real estate, it cannot meet its duty as trustee and should be removed.

Third, a trustee may only take professional advice *into consideration* as to the management of the trust; it is his duty to exercise *his own judgment* in the light of the information and advice which he receives. Scott on Trusts § 227.1, pg. 1809. And in relying on the advice of another, "he should consider whether the person giving the advice is disinterested." *Id.* Under Greg's description, Mr. Killefer relies solely on Mr. Wilson's or his firm's advice and he is improperly substituting their judgment for his own. Further, Mr. Killefer should have considered the bank's counsel's relationship with the beneficiary and co-trustee.

■ Lastly, a trustee may properly employ agents so far as such employment is reasonably necessary in the administration of the trust, but not for acts which he has the duty to perform. Scott on Trusts § 188.3 pg. 1530–31. The trustee is further limited to advice given for a specialized area. For example, he may rely upon a lawyer for advice concerning legal matters but not investment decisions. Scott on Trusts § 227.1, pg. 1810–11. In the instant case, Mr. Killefer may not properly rely upon his bank's counsel for non-legal trust decisions.

■ Mr. Killefer explained that he did not consider himself to be the permanent trust officer on this account. He explained

that the bank became co-trustee on May 18, 1990, and was aware of the difficulties between Mrs. Krug and her son. Greg had previously informed the bank that he would not accept his termination as co-trustee. To further complicate the bank's management of the trusts, many income producing assets of the trust remain frozen in the Krug Investment account. Due to the uncertainty of its position, Valley Fidelity appointed Mr. Killefer, the head of the trust department, to act as interim trust officer during the litigation. Mr. Killefer testified that, once the bank's position was clarified, another trust officer would be assigned. Although it is not clear whether the bank has a trust officer who can handle a real estate trust, it does have over 60 trust officers from whom to choose.

Mr. Killefer testified the bank had blanket insurance which would cover any trust real estate the bank was handling until insurance could be obtained. He also testified he had requested all information pertaining to the trust and its corpus from Greg but Greg was slow in sending it.

When asked why the bank paid Mrs. Krug the entire income (rent) from the Jones Bend property without paying the maintenance costs, Mr. Killefer stated the rent could not cover the maintenance costs. Mr. Killefer knew there existed other income producing assets in the partnership account and decided to wait until the freeze was taken off and then use them to pay the maintenance costs. Moreover, he testified that, due to the frozen partnership account, Mrs. Krug's sole income came from the rental of the Jones Bend property. Under the circumstances, we find this explanation understandable.

While we do not consider the actions of Mr. Killefer or Valley Fidelity to have been particularly prudent, due to the dearth of information available to the bank, the communication problems with Greg, and the lawsuit, we hold the trial court did not abuse its discretion in not removing Valley Fidelity.

The third and fourth issues are closely related. Greg claims Mrs. Krug cannot seek dissolution of Krug Investments because she is not a partner. He also contends any action for dissolution is covered under the arbitration clause of the partnership agreement.

■ We hold Mrs. Krug is a partner of the partnership. Not only does the partnership agreement say she is co-managing partner, she is a partner by virtue of her role as co-trustee of the three trusts. Greg's contention that she cannot sue as co-trustee because she does not have unanimous consent of the co-trustee is also without merit. Valley Fidelity is co-trustee and joined in the suit to dissolve the partnership.

■ We do not determine whether the dissolution was proper or if it should have been submitted to arbitration. The receivership of the partnership was not stayed either by the chancery court or this court. The partnership is dissolved and the issue is now moot. "If, because of the passage of time a case has lost its character as a present, live, controversy, or the questions involved have been deprived of their practical significance, the courts have refused to decide them because they are then 'moot' or 'academic.'" *LaRouche v. Crowell*, 709 S.W.2d 585, 587 (Tenn.App. 1985). The courts will not examine "abstract or moot questions, disconnected with the granting of actual relief, or from the determination of which no practical relief can follow. 3 C.J. 358; 4 (J.S., Appeal and Error, § 40; 3 Am.Jur., Appeal and Error, § 824.)" *Knott v. Stewart County, et al.*, 185 Tenn. 623, 207 S.W.2d 337, 338–9 (1948). The Appellant himself argued in the trial court on his motion for a stay that, if the stay is not granted, any decision in his favor by the appellate court would be useless since there would be nothing left to arbitrate. He is correct. We decline to opine on the issue as it is moot.

Lastly, Greg insists the trial court should have imposed Rule 11, T.R.C.P., sanctions against Mr. Wilson for seeking a temporary restraining order (TRO) to prevent him from obtaining partnership funds. Greg does not ask that Mrs. Krug be sanctioned, since she probably did not understand the effect of the TRO. In support of

his contention, Greg cites the court to testimony of both Plaintiffs to the effect they thought he was honest, they relied on his judgment as a co-trustee, and had no reason to believe he would harm the partnership's assets. Further, he notes the TRO was unnecessary since Morgan Keegan & Co. had frozen the partnership account six days before the complaint was filed. Rule 11, T.R.C.P., provides, in part:

> Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in his individual name, whose address shall be stated. .... The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

The most recent case construing Rule 11 sanctions is *Andrews v. Bible, et al.*, 812 S.W.2d 284, 287 (Tenn.1991). The court quoted: " 'The essence of Rule 11 is that signing is no longer a meaningless act; it denotes merit. A signature sends a message to the [trial judge] that this document is to be taken seriously.' " *Business Guides* [*v. Chromatic Communications Ent.*, [498 U.S. 533], 111 S.Ct. 922, 930 [112 L.Ed.2d 1140] (1991).] *Andrews*, at 287.

■ To determine whether the required inquiries were met, the court looks only to the circumstances as known by the attorney *at the time of signing.* To determine if sanctions are required, the trial court must use an objective test of reasonableness.

> The test to be applied in deciding whether an attorney's conduct is sanctionable, is one of objective reasonableness under all the circumstances (citations omitted), and the reasonableness of the attorney's belief must be assessed *in light of the circumstances existing at the time the document in question was signed.* *Andrews*, 812 S.W.2d at 288. (Emphasis ours.)

Whether an attorney has made sufficient inquiries in light of the circumstances is a factual determination. "The issues involved in determining whether an attorney has violated Rule 11 likewise involve 'fact-intensive, close calls.' Shaffer & Sandler 15." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 404, 110 S.Ct. 2447, 2460, 110 L.Ed.2d 359 (1990). For this reason, appellate courts review Rule 11 under the "abuse of discretion" and "deferential" standard. *Cooter*, 496 U.S. at 400, 110 S.Ct. at 2458 and at 404, 110 S.Ct. at 2460; *INVST Financial Group v. Chem–Nuclear Systems*, 815 F.2d 391, 401 (6th Cir. 1987); *Century Products, Inc. v. Sutter*, 837 F.2d 247, 253 (6th Cir.1988). This jurisdiction has adopted the federal standard of review. Our supreme court permits the use of federal law to interpret the rule's application since the Tennessee rule is identical to the federal rule. *Andrews, supra*, 812 S.W.2d at 287.

■ The record fails to show that at the time the TRO was requested Mr. Wilson knew there was no cause for seeking the TRO, nor does the record show that the Plaintiffs misrepresented facts to the chancellor when the TRO was granted, nor is there a showing of damages as a result of the TRO. In light of the animosity Greg had toward Mrs. Krug and the fact that he had the authority to write checks on the partnership account, it was not unreasonable for Mr. Wilson to request the TRO. The chancellor did not abuse his discretion in failing to grant Rule 11 sanctions.

The issues are found in favor of the Appellees. The decree of the chancellor is affirmed. The cost of this appeal is taxed to the Appellant and the case is remanded to the trial court for any further necessary proceedings.

McMURRAY and JOHN K. BYERS, Special Judge, concur.