IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
April 22, 2008 Session

# RODE OIL COMPANY, INC. AND LONG OUTDOOR ADVERTISING v. LAMAR ADVERTISING COMPANY (FORMERLY OUTDOOR COMMUNICATION, INC.)

**Direct Appeal from the Chancery Court for Madison County**
**No. 51024     Franklin Murchison, Judge**

**No. W2007-02017-COA-R3-CV  - Filed September 18, 2008**

At its core, this appeal presents a dispute over whether two parties had entered into an enforceable agreement for the lease of land to be used for the placement of a roadside billboard.  The trial court held that there existed only an offer from the property owner which was revocable and that therefore the property owner could freely lease the same property to a third party.  During the pendency of this litigation in the trial court, which took many years, a series of corporate asset transfers and acquisitions occurred—the result of which raises the question of whether the same party is in fact now on both sides of this suit.  The court below held that a live controversy still exists, and it subsequently proceeded to set damages.  For the reasons stated herein, we conclude that the trial court erred in its initial decision regarding the existence of a binding lease agreement.  Accordingly, we reverse and remand for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed and Remanded**

WALTER C. KURTZ, SR. J., delivered the opinion of the court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

David Hardee and Magan N. White, Jackson, Tennessee, for the appellant, Lamar Advertising Company (formerly Outdoor Communication, Inc.).

Larry A. Butler, Jackson, Tennessee, for the appellee, Long Outdoor Advertising.

# OPINION

## I

In this case we must determine whether a lease agreement was entered into between two parties. The trial court held that there was no agreement and eventually awarded damages. For the reasons stated herein, we reverse the decision of the trial court and remand for further proceedings consistent with this opinion.

## A

In 1995 Bill Kriesky, a lease manager with Outdoor Communication, Inc. (OCI), was assigned the task of finding potential locations for the erection of billboards in the area of Jackson, Tennessee. In June, after several weeks of searching, he decided to explore the possibility of leasing a site at the intersection of Highway 45 Bypass and Old Hickory Boulevard in Jackson. The owner of this property was Rode Oil Company, Inc. (Rode Oil). Mr. Kriesky then undertook discussions with Rode Oil's CEO, Rose Mullins.

On June 14, 1995, after several visits by Mr. Kriesky, Ms. Mullins signed a form lease provided by OCI. That document reads as follows:

> RODE OIL CO. INC as Lessor, hereby leases to OUTDOOR COMMUNICATIONS, INC., Lessee, the premises described as 1819 Hwy 45 By-Pass . . . Jackson, Madison County Tennessee . . . for an original term of 10 years beginning upon construction at the yearly rental of $2400.00 payable in Monthly installments. After the original term thereof, this lease shall continue in force from year to year for a period of seven (7) consecutive years unless terminated at the end of the original term, or any additional year thereafter, upon written notice of termination to Lessor by Lessee, served not less than thirty (30) days before the end of such term or additional year.
>
> Lessor represents and warrants that Lessor is the Owner of the premises above described, with full right and authority to make this lease, and covenants that no part of the premises above described or any adjoining premises owned or controlled by Lessor will be used for advertising purposes by anyone other than Lessee, and that Lessor will not permit Lessee's signs to be obstructed. Lessor guarantees to Lessee free access to and use of any part of any structures or other premises owned or controlled by him as may be necessary for Lessee to hang scaffolds, or construct, post, paint, illuminate, repair or remove its advertisements and structures.
>
> All structures, materials and equipment placed upon said premises by Lessee shall always remain Lessee's property and may be removed by Lessee at any time up to a reasonable time after the termination of this lease.
>
> If at any time the erection, placement, posting, painting, illumination or maintenance of its signs on the demised premises is prohibited by any law, ordinance or authority,

or building permits are either not obtained or revoked, or in the event the signs become unprofitable in the sole judgement [*sic*] of the Lessee, Lessee may terminate this lease by giving Lessor thirty (30) days' advance notice of such termination. Lessor shall thereupon return to Lessee any rent paid in advance for the unexpired term.

Neither Lessee nor Lessor is bound by any stipulation, representation or agreement not printed or written in this lease. This lease shall inure to and be binding on the personal representatives, successors and assigns of the parties hereto.

No Political Statements (i.e., abortions – morally controversial opinions)[.]
No Competitive Advertising[.]

Neither Mr. Kriesky nor anyone else signed this document on OCI's behalf at this time. Simultaneously, Ms. Mullins also executed an affidavit. It reads:

The undersigned Rode Oil Co., Inc., makes oath that Outdoor Communications, Inc. has leased for valuable consideration so much of the premises located at 700B Old Hickory Blvd. Jackson TN as may be necessary to construct advertising sign structure(s) thereon, and that the term of the lease with options exceed the terms of the permit(s) issued by the State of Tennessee for said structures and/or faces.

OCI then used this affidavit in conjunction with its applications for billboard permits.[1]

A couple days after obtaining Ms. Mullins's signature on these documents, Mr. Kriesky and an operations manager from OCI, went to the site to gather information that would be needed in determining exactly how the sign should be placed and installed. A mark was sprayed on the pavement to indicate where the sign was to be erected. Rode Oil's agents were consulted about the precise placement of the billboard, and both parties agreed on a particular location. Mr. Kriesky then undertook the process of obtaining permits for OCI's billboard from the City of Jackson and the State of Tennessee. The City of Jackson granted OCI a permit on July 10, 1997, and the State followed suit four days later. On August 1, 1995, OCI ordered the billboard structure from an ironworks in Memphis and began preparing for its installation. This, however, apparently did not involve any work at the site where the billboard was to be erected.

It was at this time that Vicki Couch, the President of Rode Oil, was approached by a representative of Long Outdoor Advertising (Long), a general partnership and competitor of OCI's. Long desired to lease the site for placement of its own billboard. Ms. Couch informed Long of Rode Oil's very recent dealings with OCI, and Long opined that the document signed by Ms. Mullins was

---

[1] At the trial of this matter in 1998, an objection was made to introduction of this affidavit because opposing counsel contended that he had not been notified, as required by the local rules, that it would be offered as an exhibit. The trial court received it for purposes of identification, apparently sustaining the objection (though this is not entirely clear from the hearing transcript). That ruling has not been appealed. Nonetheless, it does not seem to be denied that Ms. Mullins did in fact sign this affidavit.

not binding. Long offered Rode Oil $1,200.00 more per year than OCI was to pay. Rode Oil then decided that its property should be home to Long's billboard rather than OCI's.

Rode Oil announced its decision to OCI in a letter dated August 29, 1995. That letter reads as follows:

> Our company executed a purported lease for an outdoor advertising structure with you in June of this year. It is now nearly September and you have yet to start construction of an outdoor advertising structure, we've heard nothing from you since early June and have yet to receive any rent.
>
> I am advised that this lease amounts to no more than an option to lease and is, therefore, if not void, voidable by either party.
>
> Therefore, let this letter serve as our notice to you of our termination of any and all of our rights and obligations, if any, under the purported lease agreement dated June of 1995, between Outdoor Communications, Inc., and Rode Oil Co., Inc., a copy of which is attached.

This letter was signed for Rode Oil by Ms. Couch. Rode Oil and Long then entered into their own lease for the Rode Oil site. It seems uncontested that prior to sending the letter quoted above Rode Oil never contacted OCI to inquire about its intentions or to complain that it was not being paid any rent.

On September 1, 1995, Steve Lawrence, OCI's division manager, signed the lease that had previously been signed for Rode Oil by Ms. Mullins. He also marked out the phrase "upon construction" and wrote the date September 1, 1995 in its place. OCI denies that Mr. Lawrence did these things at this time as a result of being notified of Rode Oil's actions. Instead, OCI maintains that it was signed at this time because rent is normally paid at the first of the month, and this structure was projected to be completed in September. Notwithstanding these developments, OCI proceeded with construction of its billboard, which was installed on September 28, 1995. Rode Oil says that it allowed this only because it believed it had a duty to mitigate damages.

**B**

Litigation was initiated on September 27, 1995 when both Rode Oil and Long together filed a complaint for declaratory judgment in the Chancery Court for Madison County. OCI was named as the defendant. In their complaint, Rode Oil and Long took the position that Ms. Mullins had not signed a lease with OCI, but rather that she had made an offer which was freely revocable prior to its acceptance. Accordingly, they prayed for a declaration that Rode Oil had duly revoked prior to any acceptance by OCI and that Rode Oil could legally lease this site to Long. They also sought compensation for lost profits and revenues.

On October 10, 1995, OCI filed an answer and therein counterclaimed alleging that Rode Oil had breached its agreement with OCI. It therefore sought damages for that breach and also treble

-4-

damages from Long for tortious interference with contract.[2] After the trial court's denial of a motion for summary judgment, the case was tried on August 24, 1998. No evidence of damages was presented at this hearing.

The trial court issued a letter ruling on November 17, 1998. As to this issue, the letter states simply: "[T]he Court finds that Rode Oil Company had a right to terminate its offer, but it will be necessary to have another hearing on the issue of damages[.]" Over two years after the case had been tried, a formal order reflecting the trial court's decision had not yet been entered. On September 27, 2000, an order was entered by the trial court *sua sponte* requiring the parties to file a request that the case not be dismissed for failure to prosecute; Rode Oil and Long then so requested. Even still, an order containing the trial court's ruling was not entered until February 15, 2002—almost four years after the trial. In pertinent part, the trial court's order reads: "[T]he Court hereby finds that Rode Oil Company, Inc. had the right to terminate the lease by its letter of August 29, 1995."[3] The order also stated that a hearing on damages should be set.[4]

A damages hearing was not ultimately held until June 11, 2007. Following this hearing, the trial court determined that Long was owed damages in the amount of $63,000.00; Long was also awarded prejudgment interest in the amount of $34,589.54. Not having put on any proof of its damages at this hearing, Rode Oil received nothing in monetary relief. This appeal followed.

## C

The parties to this appeal are not the same as they were when the case was filed in 1995. It is undisputed that Lamar Advertising Company (Lamar) purchased OCI's assets on October 1, 1998, and Lamar was substituted for OCI. Lamar then continued in this litigation under its own name.[5]

There have been other changes as well. First, Rode Oil appears to have sold the property at issue prior to the trial in 1998; rent is now paid to its successor. More importantly, Long entered into an asset purchase agreement with DeLite Outdoor Advertising of Tennessee, Inc. (DeLite) on July 31, 1997. Since then Long has apparently continued to exist in a much diminished form. DeLite's assets were subsequently purchased by Lamar.

After the 1998 trial but before the damages hearing, Lamar moved to have this case dismissed on the basis of these changes. The evidence shows that four leases (including the one at

---

[2] This claim was made under Tenn. Code Ann. § 47-50-109.

[3] Technically speaking there is a difference between terminating an "offer" (which the letter says occurred here) and terminating a "lease" (which is what the order eventually entered actually says took place). While this could potentially be important, no one has suggested that this discrepancy presents a problem for the trial court's order.

[4] Following entry of this order, Chancellor Morris, who had tried the matter initially, passed away, and Judge Murchison was designated by the Supreme Court to hear the remainder of the case in his stead.

[5] Lamar is therefore the party actually appealing from the trial court's decisions.

issue here) were in litigation at the time of Long's asset sale to DeLite. The asset purchase agreement between DeLite and Long specifically mentioned those four "litigation leases" and provided that this litigation would continue. If Long proved to be successful in its litigation concerning its lease with Rode Oil, the agreement required Long to then transfer the lease to DeLite. If unsuccessful in the Rode Oil suit, Long was under no obligation to make any transfer. The question raised by Lamar's motion was whether Long had retained in its contract with DeLite any right to proceeds from this litigation.

At the hearing below on this issue, Lamar contended that the language of the contract between Long and DeLite unambiguously establishes that any proceeds received from this litigation would have been the property of DeLite (whose assets now belong to Lamar). Long argued otherwise, maintaining that it had retained the rights to any proceeds from the "litigation leases." The trial court ruled that the asset purchase agreement was ambiguous and that it would therefore consider parol evidence to determine ownership of these potential proceeds. Based upon the testimony of the witnesses at the September 12, 2006 hearing, it concluded that Long had retained ownership rights to any such proceeds; it thus denied Lamar's motion.

**II**

Although this litigation required several hearings, the trial court each time acted as the finder of fact and resolved the questions before it without a jury. Findings of fact made by the trial court in a bench trial are reviewed "de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d); *see, e.g., Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996). "Because of the presumption, an appellate court is bound to leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true." *Nashville Ford Tractor, Inc. v. Great American Insurance Co.*, 194 S.W.3d 415, 425 (Tenn. Ct. App. 2005) (citing *Estate of Haynes v. Braden*, 835 S.W.2d 19, 20 (Tenn. Ct. App. 1992)). "For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect." *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citations omitted). A trial court's conclusions of law, however, are reviewed "de novo, with no presumption of correctness." *Colonial Pipeline Co. v. Nashville & Eastern R.R. Corp.*, 253 S.W.3d 616, 620 (Tenn. Ct. App. 2007) (citations omitted); *see* Tenn. R. App. P. 13(d).

In the absence of "specific findings of fact, this Court will review the record to determine the preponderance of the evidence." *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. Ct. App. 1997) (citations omitted). This is an important part of our review in this case with respect the trial court's initial decision that Rode Oil had a right to terminate. While the trial court's order on this question contains findings of fact, none of those facts appears be contested by any party in this suit. As will be seen, resolution of this matter turns upon the legal significance that is attached to the facts in evidence rather than upon a determination of the facts themselves.

## III

## A

Lamar raises several arguments on appeal. Because of the manner in which we resolve the first of these, it is largely unnecessary for us to address the other issues presented. We must, though, briefly address one of those pretermitted issues solely for the limited purpose of ascertaining whether this case still presents a live, justiciable controversy.

"Cases must be justiciable not only when they are first filed but must also remain justiciable throughout the entire course of the litigation, including the appeal." *McIntyre v. Traughber*, 884 S.W.2d 134, 137 (Tenn. Ct. App. 1994) (citations omitted); *see, e.g., Krug v. Krug*, 838 S.W.2d 197, 204 (Tenn. Ct. App. 1992). A moot case is generally said to be one that has lost its justiciability and will be dismissed unless one of the recognized exceptions to the doctrine of mootness applies. *Alliance for Native American Indian Rights in Tennessee, Inc. v. Nicely*, 182 S.W.3d 333, 339 (Tenn. Ct. App. 2005). The question for us here is whether, as a result of the various actions taken by the parties after the events giving rise to this dispute, Lamar effectively acquired both sides of this lawsuit. If Long were to now be unable to recover anything from further prosecution of this suit, then no live controversy would exist, and this case would be moot. *See McIntyre*, 884 S.W.2d at 137 ("A case will generally be considered moot if it no longer serves as a means to provide relief to the prevailing party.") (citations omitted). As noted above, Lamar raised this issue in the trial court by filing a motion to dismiss, which was denied after an evidentiary hearing; on appeal Lamar argues that the trial court erred in denying its motion.

Without reaching the merits of the trial court's decision on that motion specifically, we conclude that this case does still present a justiciable controversy. The hearing below mostly addressed ownership of any damages that might be awarded in this litigation. Even if the trial court erred in finding that Long had retained ownership of any such damages, the asset purchase agreement provides that Long would be entitled to a "finder's fee" for successfully obtaining rights to any of the "litigation leases" and then transferring them to DeLite. Because of this right to payment of a "finder's fee," Long still possesses an actual, pecuniary interest in this litigation regardless of who owns the proceeds, and this case therefore cannot be deemed moot.

## B

The controlling issue in this case is that raised by Lamar regarding the trial court's ruling that the document signed by Rode Oil constituted nothing more than a revocable offer.[6] Lamar contends that the document signed by Ms. Mullins for Rode Oil on June 14, 1995 was at that time an

---

[6] As mentioned above, there is a discrepancy between the trial court's letter ruling and its subsequent order. The parties apparently read the order in light of the letter—thus, they treat the court's ruling as one finding a revocable offer. We will do the same.

enforceable contract—specifically, a lease to commence *in futuro*. Long[7] takes the position that the document merely constituted an offer to lease, and, moreover, that this offer could only be accepted by performance. Beginning performance, says Long, means construction of the billboard. Since OCI had not even begun to construct the billboard when Rode Oil terminated its offer, Long argues that Rode Oil was within its rights to so terminate. In the alternative, Long asserts that, even if this is viewed as a case of a bilateral rather than a unilateral contract, OCI never accepted Rode Oil's offer; relatedly, it also argues that the consideration for any bilateral contract is illusory because OCI was never obligated to construct a billboard on Rode Oil's property.[8]

At the outset of our analysis we must note that we have some difficulty in interpreting the trial court's order of February 15, 2002. That is to say, it does not make a distinction between the termination of an offer that could be accepted only by performance and the termination of an offer that could be accepted by a return promise or other manifestation of assent. This type of distinction could potentially be significant, but it is not in this case because we conclude that the trial court erred in finding a revocable offer at all. Instead, the facts here properly lead to the conclusion that Rode Oil and OCI had entered into an enforceable bilateral contract. For that reason, we reverse the decision of the trial court.

*1. Unilateral Contract Analysis*

Long urges us to view the document signed by Rode Oil on June 14, 1995 as merely an offer for a unilateral contract.[9] "In forming a unilateral contract only one party makes a promise: the offeror makes the promise contained in the offer, and the offeree renders some performance as acceptance." 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 3.4, at 205 (3d ed. 2004). In contrast to the unilateral contract is the bilateral contract. "In forming a bilateral contract each party makes a promise: the offeror makes the promise contained in the offer, and the offeree makes a promise in return as acceptance." *Id.*; *see, e.g., Sauner v. Public Service Auth. of South Carolina*, 581 S.E.2d 161, 165-66 (S.C. 2003). The difference between the two is "that the offeror of a unilateral contract seeks performance in exchange for a promise, while the offeror of a bilateral contract seeks a return promise." *Owen v. MBPXL*, 173 F.Supp.2d 905, 915 (N.D. Iowa 2001) (citing Samuel Williston, *Williston on Contracts* § 1:17, at 41 (Richard A. Lord, 4th ed. 1990)).

Long's argument that the lease agreement here was simply an offer for a unilateral contract must be rejected. First, we note that many authorities speak of a long-established presumption

---

[7] We will only refer to the arguments of Long even though both it and Rode Oil were represented by the same counsel in the trial court. Their interests in this appeal appear to be, at least for our purposes here, identical.

[8] We acknowledge that drawing a distinction between unilateral and bilateral contracts and then analyzing the facts accordingly has fallen into disfavor in much of modern contract law. *See, e.g.,* 1 E. Allan Farnsworth, *Farnsworth on Contracts* § 3.4, at 206 (3d ed. 2004). Tennessee courts, however, have maintained this dichotomy. *See generally* 21 Steven W. Feldman, *Tennessee Practice: Contract Law and Practice* § 1:5 (2007).

[9] Both sides of this appeal seem to accept that Rode Oil would be deemed the offeror and OCI the offeree. We will accept that formulation. We do note, though, that OCI clearly first approached Rode Oil about leasing its property.

against finding a unilateral rather than a bilateral contract where there is doubt as to which type of contract was intended. *See, e.g., Fosson v. Palace (Waterland), Ltd.*, 78 F.3d 1448, 1453-54 (9th Cir. 1996) (citation omitted); *Craddock v. Greenhut Construction Co.*, 423 F.2d 111, 113-14 (5th Cir. 1970) (citations omitted); *Davis v. Jacoby*, 34 P.2d 1026, 1030 (Cal. 1934); *Motel Services, Inc. v. Central Maine Power Co.*, 394 A.2d 786, 787-88 (Me. 1978); *Restatement (First) of Contracts* § 31 (1932). Furthermore, "whether a proposal is meant to be an offer for a unilateral contract is determined by the outward manifestations of the parties, not by their subjective intentions." *Goodkind v. University of Minnesota*, 417 N.W.2d 636, 639 (Minn. 1988); *see also Hoffman-La Roche, Inc. v. Campbell*, 512 So.2d 725, 731 (Ala. 1987) (citation omitted). Here, there is in fact very little in the way of objective evidence to indicate that this was meant to be an offer that could be accepted only by performance. And, practically speaking, while unilateral contracts may make sense in certain contexts, in a case such as this—where the expenditure of substantial amounts of time and money would reasonably be expected for the procurement of billboard permits, the design of plans for the structure, and the purchase of building materials all prior to performance—it seems highly unlikely that sophisticated businesspeople would have chosen to bargain in the unilateral mode.

Instead, the document signed by Rode Oil styles itself as a "lease" (not an "offer to lease") and contains all the essential terms of a final agreement, including OCI's obligation to pay rent in exchange for Rode Oil's obligation to lease the property as soon as the billboard was constructed. Even the failure of OCI's agents to sign the lease until September 1, 1995 could at most be said to suggest that Rode Oil had made an offer for a bilateral contract that was never properly accepted by OCI prior to the offer's revocation. This, however, necessitates a different inquiry than that required by a unilateral contract analysis.[10]

---

[10] We feel compelled to note that, even if this were an offer for a unilateral contract, it is a potentially perilous overstatement to say that the offer would invariably be revocable at any time prior to acceptance by performance. *See Restatement (Second) of Contracts* § 45 (1981) (stating that an option contract is created when an offer invites acceptance by performance rather than promise and the "offeree tenders or begins the invited performance or tenders a beginning of it"); *see also Hutchinson v. Dobson-Bainbridge Realty Co.*, 217 S.W.2d 6, 10-11 (Tenn. Ct. App. 1946); *see generally* Peter Meijes Tiersma, *Reassessing Unilateral Contracts: The Role of Offer, Acceptance, and Promise*, 26 U.C. Davis L. Rev. 1, 28-32 (Fall 1992). We do not need to consider whether OCI's activities here were sufficient to render Rode Oil's offer irrevocable because we conclude that this was not an offer that had to be accepted by performance.

*2. Bilateral Contract Analysis*

Long argues in the alternative that there was here an offer for a bilateral contract, but that OCI never accepted Rode Oil's offer. Thus, contends Long, no contract was ever formed, and the offer was freely revocable at the time Ms. Couch sent her letter. Based upon our review of the record, we conclude that this was an offer for a bilateral contract and moreover that OCI had accepted it prior to Rode Oil's purported revocation. Two facts could conceivably be cited to suggest otherwise—OCI's delayed signing and the use of "upon construction" to denote the point at which the lease would commence.[11] Neither of these facts, however, ultimately supports the conclusion that there was no lease between OCI and Rode Oil.

Long concedes, as it must, that a signature from OCI was not actually required to make this an enforceable agreement. *See* 17 C.J.S. *Contracts* § 75 (2008) ("Where a contract is enforced on the basis of a single signature, it must generally be signed by the party to be charged under the contract and delivered to [the] nonsigning party who indicates acceptance by performing.") (citations omitted); *cf. Blair v. Brownson*, 197 S.W.3d 681, 684-85 (Tenn. 2006). "When only one party signs a written contract that contemplates the signatures of both parties (but does not expressly require it), the law considers it to bind both parties when the non-signing party accepts it." *Moody Realty Co., Inc. v. Huestis*, 237 S.W.3d 666, 675 (Tenn. Ct. App. 2007) (citation omitted).

It might be argued, though, that the lack of a signature by OCI is significant here because it demonstrates that OCI did not truly intend to bind itself to the agreement, and it thus never accepted Rode Oil's offer. The failure of OCI's agents to sign is curious, and the evidence presented at the trial on this issue does little to clarify why no one signed the lease on OCI's behalf until September 1, 1995. The testimony below indicated that Mr. Kriesky took the lease back to his office sometime after June 14, 1995 and that his superior was to sign it. At one point in the hearing on this issue, OCI's president, A.B. Isbell, seemed to testify, although equivocally, that Mr. Kriesky had no authority himself to sign the agreement and that the assent of his supervisor was required. Mr. Isbell also appeared to indicate that this was normal OCI practice, but there is no evidence to suggest that Rode Oil was informed when Ms. Mullins signed the lease that OCI only would consider itself bound once it was ready to begin construction . To the contrary, Rode Oil's agents seemed to believe that there was an enforceable lease up until Rode Oil received a higher offer from Long. They apparently only then decided that Ms. Mullins's signature on the document was merely an offer—or, as described by Ms. Couch at one point in her August 29th letter, "a purported lease."

The question in reviewing these facts is whether they indicate that OCI had accepted the

---

[11] For the sake of greater clarity, we will discuss use of this "upon construction" language apart from our bilateral contract analysis so as to first consider the question of assent before moving to the separate issue of whether there was an "illusory promise." Long seems to imply that use of the phrase "upon construction" indicates a lack of assent by OCI, but the real thrust of its argument with respect to the use of "upon construction" is that it makes any return promise by OCI "illusory." In any event, we reject both of these arguments.

contract prior to Rode Oil's attempted revocation.[12] *See Moody Realty*, 237 S.W.3d at 675. "[T]he existence of a contract, the meeting of the minds, the intention to assume an obligation, and the understanding are to be determined in case of doubt not alone from the words used, but also the situation, acts, and the conduct of the parties, and the attendant circumstances." *Gurley v. King*, 183 S.W.3d 30, 43 (Tenn. Ct. App. 2005) (quoting 17 Am. Jur. 2d *Contracts* § 1 (1964)). Mutual assent to be bound is critical. *T.R. Mills Contractors, Inc. v. WRH Enterprises, LLC*, 93 S.W.3d 861, 866 (Tenn. Ct. App. 2002). "In determining mutuality of assent, courts use an objective standard based on the manifestations of the parties." *Id.* (citing 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 30:3 (4th ed. 1999)). Assent to a contract need not take the form of words, but may instead be "manifested, in whole or in part, by the parties' spoken words or by their actions or inactions." *Burton v. Warren Farmers Co-op.*, 129 S.W.3d 513, 521 (Tenn. Ct. App. 2002) (citations omitted). "[I]n some instances performance or even preparation for performance may suffice" to give notice of acceptance by a promise. 1 Farnsworth, *supra*, § 3.15, at 300; *see Restatement (Second) of Contracts* § 19 (1)-(2) (1981) (stating that assent may be made by acts other than words so long as the party "intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents"). Whether an action constitutes an acceptance must be assessed in terms of whether it "would lead a reasonable person to conclude that the offer has been accepted." *Overman v. Brown*, 372 N.W.2d 102, 105 (Neb. 1985) (citing *In re Mapes Enterprises, Inc.*, 15 B.R. 192 (D. Nev. 1981)). It must be noted, though, that mutuality of assent may not be inferred from a party's unilateral actions, from an ambiguous course of dealing, or "solely [from] the uncommunicated intentions or states of mind of the contracting parties." *Burton*, 129 S.W.3d at 521 (citations omitted); *see Balderacchi v. Ruth*, 256 S.W.2d 390, 391 (Tenn. Ct. App. 1953).

There is no small amount of irony presented by the arguments in this case. Long argues that Rode Oil was never bound to a contract because OCI was secretly (or at least discretely) intending to delay its own commitment to the lease prior to commencing construction of the billboard. Therefore, OCI did not sign the agreement and ensured that its rent payments would not be due until construction (an event which it could forestall). Lamar, on the other hand, denies that OCI had not accepted the offer and asserts instead that OCI had bound itself to the agreement. The problem for Long's position is that it requires us to examine OCI's subjective intentions and, potentially, then allow those to predominate in importance over the natural implications of OCI's conduct.

Of course, it is possible to conclude that a binding agreement was made between Ms. Mullins and Mr. Kriesky on June 14, 1995. That would render any subsequent attempt at revocation ineffective. But, even if we were to hold that a contract had not been formed at the time Ms. Mullins signed the lease, OCI's subsequent actions surely must be taken to objectively evidence that OCI assented to it soon thereafter. Rode Oil never indicated that it required a specific form or manner of acceptance. Following the signing of the lease by Ms. Mullins, OCI began to undertake action to construct a billboard on the Rode Oil site. This included visits to the site by OCI's agents in order

---

[12] It is often said that a contract requires "a meeting of the minds," but that phrase is now widely recognized as misleading. *See, e.g., Colfax Envelope Corp. v. Local No. 458-3M*, 20 F.3d 750, 752 (7th Cir. 1994) (Posner, J.) ("The premise—that a 'meeting of the minds' is required for a binding contract—obviously is strained.") (citation omitted).

to determine the billboard's exact location, a matter on which Rode Oil was very clearly consulted.[13] The location of the billboard was marked in paint, and it was later repainted by OCI when rain washed away the first mark. Permit applications were submitted and then approved. And, the structure itself was ordered from an ironworks. None of this appears to be in dispute. Although not all of these facts may have been known to Rode Oil at the time, the evidence does indicate that Rode Oil's agents were at least aware of (and agreed to) the marking of the spot where the billboard was to be placed, and they knew that billboard permits were being applied for. *Cf.* 1 Farnsworth, *supra*, § 3.15, at 300 ("If the promise is implied from conduct other than words, such as preparing for or beginning performance, the offeree is usually expected to give notice of acceptance or of the conduct amounting to acceptance if it would not otherwise come promptly to the offeror's attention."). Notwithstanding the failure of OCI to sign the lease, any reasonable observer of these actions would have concluded that OCI had accepted Rode Oil's offer and that OCI was acting under the agreement. Moreover, the actions of which Rode Oil had knowledge would have just as reasonably indicated this.

Whatever OCI's reasons for not actually signing the lease until September 1st, they are irrelevant. The same is true of what Mr. Isbell may now say about the necessity of someone other than Mr. Kriesky signing OCI's leases. Acting in a manner that indicates acceptance of a contract is generally deemed to be acceptance—at least in the absence of a requirement that the acceptance take a different form. Unless the other party has reason to know of it, contract law does not typically credit a claim that, in spite of a party's objective manifestations of assent, it subjectively did not intend to be bound. *See* 1 Farnsworth, *supra*, § 3.7, at 213; *see also Robbins v. Lynch*, 836 F.2d 330, 332 (7th Cir. 1988) ("You can't escape contractual obligation by signing with your fingers crossed behind your back, even if that clearly shows your intent not to be bound."); *see, e.g., Lucy v. Zehmer*, 84 S.E.2d 516 (Va. 1954). Here, OCI undertook certain actions intentionally. From these actions, Rode Oil (or anyone else) would have naturally concluded that the offer had been accepted and a lease agreement had been entered into. It is of no consequence whether or not these activities were intended to be a manifestation of acceptance of Rode Oil's offer. *Cf.* 1 Farnsworth, *supra*, § 3.6, at 210 ("[A]s long as one intended to engage in those actions, there is no further requirement that the actions were done with the intention of assenting to an agreement."). They nevertheless reasonably and indisputably indicate assent and are therefore effective to create a binding agreement. The only remaining question for us now to decide is whether the use of "upon construction" to indicate the commencement of the lease term precludes the existence of a valid contract.

---

[13] This is evidenced in the testimony of Mr. Kriesky. The trial court's order states that he testified "that between the time Rode Oil Company, Inc. signed the lease and thereafter until August 29, 1995, there were no significant communications between Rode Oil Company, Inc. and Defendant." While one might quibble over the meaning of the word "significant," the hearing transcript plainly shows that he did testify about the events we have mentioned; and no other evidence contradicts Mr. Kriesky's account. We conclude that these actions, including some apparent communications with Rode Oil's agents, are in fact significant.

*3. Illusory Promise Analysis*

In its argument concerning the existence of a bilateral contract, Long asserts that, even if OCI did accept Rode Oil's offer, use of the phrase "upon construction" in the lease to indicate the point at which its term would begin renders any promise by OCI illusory. If OCI never erected the billboard, then it would never be bound to pay Rode Oil for leasing its property. Accordingly, reasons Long, OCI did not actually commit to undertaking any action, and no contract was formed.

"A party attempting to prove the existence of a contract 'is required to show that the agreement on which he relies was supported by adequate consideration[.]'" *Calabro v. Calabro*, 15 S.W.3d 873, 876 (Tenn. Ct. App. 1999) (quoting *Price v. Mercury Supply Company, Inc.*, 682 S.W.2d 924, 933 (Tenn. Ct. App. 1984)). The absence of consideration "renders the contract, undertaking, or promise void and unenforceable as between the parties." 21 Steven W. Feldman, *Tennessee Practice: Contract Law and Practice* § 5:1 (2007). Consideration may take a number of different forms, including a return promise. *See, e.g., Estate of Hordeski v. First Federal Savings and Loan Ass'n of Russell County, Ala.*, 827 S.W.2d 302, 304 (Tenn. Ct. App. 1991) ("It may be a promise for a promise.").

However, "[w]ords of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise." *Restatement (Second) of Contracts* § 77, cmt. a. This is referred to as an "illusory promise." A promise may be illusory because it "essentially promis[es] nothing at all, or allow[s] the promisor to decide whether or not to perform the promised act." *Walker v. Ryan's Family Steak Houses, Inc.*, 289 F.Supp.2d 916, 929 (M.D. Tenn. 2003) (citations omitted), *aff'd*, 400 F.3d 370 (6th Cir. 2005), *cert. denied*, 546 U.S. 1030, 126 S. Ct. 730 (2005). Similarly, a "promise may also be illusory if it is too indefinite to be enforceable." *Id.* Courts do, however, generally endeavor to avoid finding that a promise was illusory and that there was thereby a failure of consideration. *See, e.g.,* 1 Farnsworth, *supra*, § 2.13, at 136.

We must disagree with Long that the promise made here by OCI was illusory. "Every contract imposes upon the parties a duty of good faith and fair dealing in the performance and interpretation of the contract." *Elliot v. Elliot*, 149 S.W.3d 77, 84-85 (Tenn. Ct. App. 2004) (citations omitted). Although this implied covenant cannot be used to create new contractual obligations or to alter the specific terms of a contract, *see, e.g., Goot v. Metro. Gov't of Nashville & Davidson County*, No. M2003-02013-COA-R3-CV, 2005 WL 3031638, at *7 (Tenn. Ct. App. Nov. 9, 2005) (citations omitted), courts often imply this covenant in order to prevent a promise from being deemed illusory. *See, e.g., Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th 44, 61 (Cal. Ct. App. 2002).

Perhaps the most famous instance of this is to be found in Justice Cardozo's opinion for the New York Court of Appeals in *Wood v. Lucy, Lady Duff-Gordon*, 118 N.E. 214 (N.Y. 1917). In *Wood* the plaintiff and defendant had entered into a contract whereby the plaintiff "was to have the exclusive right . . . to place [the defendant's] indorsements on the designs of others . . . [and] . . . also to have the exclusive right to place [the defendant's] designs on sale, or to license others to market them." *Id.* at 214 The defendant breached this agreement and was sued. For her defense, the defendant contended that no contract existed because the plaintiff never made a return promise

binding him to act. *Id.* The court rejected this argument and concluded that a "promise to pay the defendant one-half of the profits and revenues resulting from the exclusive agency and to render accounts monthly was a promise to use reasonable efforts to bring profits and revenues into existence." *Id.* at 215. "In the same vein, covenants to use 'good faith' or 'best efforts' to generate profits for the licensor are routinely implied where the licensor grants exclusive promotional or licensing rights in exchange for a percentage of profits or royalties, but the licensee does not expressly promise to do anything." *Third Story Music, Inc. v. Waits*, 41 Cal. App. 4th 798, 805 (Cal. Ct. App. 1995). Similarly, because of this implied covenant of good faith, courts often uphold contracts that are made contingent upon the securing of financing on acceptable terms. *See, e.g., Mezzanotte v. Freeland*, 200 S.E.2d 410, 414-16 (N.C. Ct. App. 1973).

Another case is particularly instructive. In *Magruder Quarry & Co., L.L.C. v. Briscoe*, 83 S.W.3d 647 (Mo. Ct. App. 2002), the defendants were granted a lease to property "for the purpose of mining, quarrying, removing, and marketing limestone rock." *Id.* at 648. The lease provided that the rental rate would be "eighteen cents ($0.18) per ton of any and all rock product sold during the preceding month[.]" *Id.* In a suit against the lessees, the trial court held that the contract was null and void because this was no promise at all. *Id.* at 650. Reading into the parties' contract an implied covenant of good faith and reasonable efforts, the appellate court reversed and concluded that the contract was supported by adequate consideration. *Id.* at 652; *see Cordry v. Vanderbilt Mortg. & Fin., Inc.*, 445 F.3d 1106, 1110-11 (8th Cir. 2006).

Likewise, we here believe that use of the term "upon construction" does not make the lease agreement illusory. Essentially, employment of this as a commencement date seems to be a reflection of the fact that obtaining proper permits for a billboard and determining the precise engineering requirements for its erection can take a different amount of time than might be anticipated at the making of the lease. One can imagine innumerable scenarios in which use of an exact date is unappealing to the parties and reference to events is preferred. This does not mean that there is no agreement between them until the happening of the event. Instead, there was here an implied covenant by OCI to act in good faith and to use its best efforts to construct a billboard. Upon construction, rent would be paid. OCI was under an obligation to bring this about within a reasonable time; it did. Therefore, there existed a genuine promise serving as consideration for the agreement, and the terms of the agreement must be said to have been set out with such reasonable definiteness as to give rise to an enforceable contract. *See* 7 Tenn. Jur. *Contracts* § 25 (2005) ("The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.").

## IV

Because we conclude that Rode Oil and OCI had entered into a valid and enforceable lease agreement, we hold that Rode Oil wrongfully breached this agreement when it dispatched its letter of August 29, 1995 attempting to revoke its offer so that it could instead lease the site to Long.  The decision of the trial court is therefore reversed, the complaint filed by Rode Oil and Long is dismissed, and this case is remanded for further proceedings consistent with this opinion.  We need not address the remaining issues raised on appeal.  Costs of this appeal are taxed to Long and Rode Oil for which execution may issue if necessary.

_____
WALTER C. KURTZ, SENIOR JUDGE