IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 24, 2021 Session

## IN RE ESTATE OF DOROTHY JEAN MCMILLIN

Appeal from the Chancery Court for Knox County
No. 189858-2      Clarence E. Pridemore, Jr., Chancellor

———————————————————

## No. E2020-00413-COA-R3-CV

———————————————————

On behalf of the estate of his mother, one son, as substitute personal representative, filed suit against his brother, the previous personal representative, seeking return of funds alleged to be missing from the decedent's accounts. Upon summary judgment, the trial court found in favor of the defendant, the initial administrator of the estate. We reverse and remand for trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Reversed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and KRISTI M. DAVIS, J., joined.

Bruce T. Hill, Sevierville, Tennessee, for the appellant, Estate of Dorothy Jean McMillin.

Thomas M. Leveille, Knoxville, Tennessee, for the appellee, Paul L. McMillin.

## OPINION

### I. BACKGROUND

Dorothy Jean McMillin ("Decedent"), the mother of both plaintiff James McMillin ("James") and defendant Paul McMillin ("Paul"), lived at 3600 Guinn Road in Knoxville, Tennessee, on property consisting of approximately six acres. By early 2012, Decedent was experiencing various health problems.

On June 7, 2012, Paul drove Decedent to attorney Robert Wilkinson's office, at

which time Decedent requested that new estate plans be prepared.[1] After leaving Mr. Wilkinson's office, Paul drove Decedent to Regions Bank, at which time he accompanied his mother into the bank and she changed her account from an individual account owned solely by Decedent to a joint account owned by Decedent and Paul with a right of survivorship. Three weeks later, Paul drove Decedent to Y-12 Credit Union, at which time Decedent likewise changed her account from an individual account owned solely by Decedent to a joint account owned by Decedent and Paul with a right of survivorship.[2]

On June 20, 2012, Decedent signed a new Last Will and Testament, appointing Paul as the new personal representative of her estate. Pursuant to the language of Decedent's will, Paul was to distribute Decedent's property equally among her beneficiaries, share and share alike. On the same day, Decedent also signed a Durable Power of Attorney, naming Paul as agent-in-fact. According to Paul, Decedent thereafter requested that he build a new house for her on the existing property. Decedent passed away on November 18, 2012, prior to the completion of the home.

Paul was issued Letters Testamentary to administer his mother's Estate on December 21, 2012. He continued to use the money from the joint bank accounts to construct the house. Upon opening an Estate account with SunTrust, Paul issued checks to each of the four sibling beneficiaries whereby each received $100,000. These checks were issued in September 2013. The funds in the Estate account were originally held in Decedent's Vanguard account with a balance of approximately $577,897.03.

Two of Decedent's four children, Iris Davenport and James,[3] filed suit against Paul and his wife Johneta McMillin, in their individual capacities, for exercising undue influence over Decedent in an attempt to wrongfully enrich themselves. According to the complaint, Paul obtained access to a sum total of $615,055.45 from Decedent (the assets in the joint accounts). They requested that judgment be made on behalf of Decedent's Estate.

At the February 25, 2014 jury trial, Paul did not deny that he obtained the money from his mother. He testified as follows:

Q: A grand total of $615,055.45; does that sound about like the total amount that you received from those two accounts?

A: It could have been, yes, sir.

---

[1] Her prior will named James to serve as personal representative.
[2] According to Paul, Decedent believed that James and Iris wanted to put her in a nursing home and use her money to pay for it.
[3] Linda Cole is the fourth sibling.

Paul further testified he spent this money, in addition to the amounts claimed in the present matter, on the construction of Decedent's home:

> A: The monies, all of the monies that I have taken out of Regions and Y-12 has been spent on that house.
>
> Q: And you're telling the Court and the Jury that money that came out of those accounts was used to build that house?
>
> A: Absolutely.

An appraisal of the home at the time of that trial reflected a market value of $320,000. The jury rendered a verdict against Paul and his wife in the amount of $284,800.[4] It is apparent that the jury subtracted the appraised value of the house from the $615,055.45 that Paul obtained from his mother prior to her death, plus some apparent minor adjustments. This court explained the verdict in this manner as demonstrated below:

> Paul admitted that the house had been appraised at a value of approximately $320,000. He provided no explanation for the disposition of the balance of the $615,000, except to state that he withdrew cash for Decedent's use in paying her bills at her direction. The jury's verdict of $284,800 reflects the approximate difference between the $615,000 removed by Paul from the Decedent's accounts and the appraised value of the new home. Upon careful review of the record, we conclude that there is material evidence to support the jury's verdict both in substance and amount, and the verdict must be affirmed.

As administrator of the estate, Paul had the duty to collect the judgment against himself on behalf of the Estate. Due to the obvious conflict of interest, on May 23, 2014, Knox County Chancellor Michael Moyers removed Paul as the personal representative and replaced him with the designated successor personal representative, James.

After assuming the duties as personal representative, James discovered that $577,897.03 from Decedent's Vanguard account had been deposited into the Estate's SunTrust account by Paul. From the account, Paul had issued $100,000 checks to each beneficiary, leaving $177,897.03 as the balance in the account. However, when James took over, the $177,897.03 was no longer in the account.

On behalf of the Estate, James filed suit against Paul to recover the $177,897.03. The first lawsuit against Paul and his wife, in their individual capacities, did not address

---

[4]Final Judgment entered March 4, 2014. Affirmed by this court on March 31, 2015, No. E2014-00497-COA-R3-CV.

Paul's activities as personal representative. Paul answered the new complaint by citing a provision under Decedent's will and claiming that he had broad discretion on how to spend the Estate's assets.

Between March 2013, the date that the house was listed for sale with a licensed real estate broker, and May 2015, the best offer from a qualified buyer was for $275,000 for the new construction plus $5,000 for an additional one acre. This sum was $40,000 below appraised valued, as the construction of the house was incomplete. Tammy Garber, the licensed real estate agent who listed the property, stated in an affidavit that "at the time of the sale" the property "was uninhabitable, requiring significant work to bring it up to code." An appraisal estimated the cost to complete the construction at $59,455; it further indicated that "a large sinkhole on the property . . . negatively affected the marketability of the property."

James, in his capacity as successor personal representative, sought and received court approval to sell the house ($275,000) and a one acre adjoining lot ($5,000) for the sum of $280,000, because the Estate had insufficient funds to complete the construction of the home. Relying upon this order, the property was sold on September 23, 2015, for $280,000.  The adjacent "old home," with significant mold problems,[5] was sold for $153,000; there were no objections filed by any beneficiaries, including Paul.

After Paul acknowledged in a deposition that he spent the additional $177,897.03 on building the house, the Estate filed a motion for summary judgment.  Paul's defense in the prior jury case had been the same--that he spent all of the funds in Decedent's accounts ($615,055.45) to build the house. Now, including these additional funds, Paul claimed that he spent $792,952.48 to build an uncompleted house that sold for $275,000.  Taking the facts in a light most favorable to Paul, the Estate argued that Paul had breached his fiduciary duty and wasted the Estate's assets. The Estate asserted that Paul should be estopped from claiming the money that had been spent on the construction of the house, as the jury in the prior case had already determined what credit he was entitled to receive for the house. Additionally, the Estate argued that Paul breached his fiduciary duties by failing to provide a full inventory and accounting of his expenditures during his tenure as the personal representative, as ordered by the probate court. James contended that he was unable to discover the misappropriation sooner due to Paul's failure to abide by the probate court's ruling.

There was no trial in this case. Rather, the trial court made a final ruling based on competing motions for summary judgment. The trial court ruled in Paul's favor, finding that he was not restrained in how he spent the Estate's assets. The court ruled, in relevant part, as follows:

[5]According to Garber's affidavit, the estimate to remediate the mold issue was "as much as $30,000."

- 4 -

Prior to her death, [Decedent] requested that Defendant Paul McMillin build a new house for her on the land adjacent to her then older house. Pursuant to her request, Paul began building the house prior to her death.

After [Decedent] passed away on November 13, 2012, Defendant Paul McMillin continued to build the new house located at 3602 Guinn Road ….

The Last Will and Testament of [Decedent] . . . granted the personal representative the full authority and discretion to improve and "deal with" real property along with "the continuing, absolute, discretionary power to deal with any property, real or personal, held in any trust, as freely as I might in the handling of my own affairs."

"The Will" also granted the Personal Representative the power and authority to "make repairs, replacements, and improvements, structural or otherwise, to any such real estate."

"The Will" further provides that "unless a fiduciary acts capriciously and arbitrarily, my estate or a trust shall indemnify the fiduciary for all expenses (including attorney fees) which he or she incurs or expends or which arises from the exercise of his or her discretion."

* * *

On April 1, 2014, Jessica Vinsant made a written offer to purchase the "house" for . . . $495,000 ….

At that time, it was the opinion of Defendant Paul McMillin that the "house" was worth at least . . . $495,000 ….

The "house" was subsequently sold by Plaintiff James McMillin when he became successor Personal Representative, for the sum of . . . $280,000 ….

The "house" was sold "as is" when it could have been completed with the expenditure of additional funds from the estate.

The realtor who listed the "house" recommended that the Personal Representative complete the house.

Plaintiff James McMillin testified that he decided not to finish the house before selling it, and that it was his decision not to do so.

When Defendant Paul McMillin expended the . . . $177,000 . . . on the house located at 3602 Guinn Road, he did it because he believed that the expenditure of those funds on the "house" was in the best interests of the Estate and in the best interest of the beneficiaries of "The Will."

Defendant Paul McMillin expended the funds in the good faith belief that it was appropriate to do so to get the best value out of the "house."

The "house" was sold for . . . $280,000 . . . by Plaintiff James McMillin as the Personal Representative of the Estate.

The "house" was subsequently sold by the purchaser on October 31, 2017, for . . . $467,500 . . . .

\* \* \*

Plaintiff James McMillin has not made any claim that there was defective construction in relation to the "house."

Defendant Paul McMillin has testified that the approximate . . . $177,000 . . . in question was utilized solely in relation to the "house."

Plaintiff James McMillin has testified that he does not have any knowledge and is not aware of any evidence that would reflect that Defendant Paul McMillin spent the . . . $177,000 . . . on anything other than the house at 3602 Guinn Road.

Therefore, this Court is of the opinion that Defendant's Motion for Summary Judgment shall be GRANTED . . . .

The Estate filed a motion seeking an interlocutory appeal of the rulings, arguing that it was a waste of judicial resources to rule on Paul's claim for attorney fees until the appeal was resolved. The trial court denied that motion and opted to issue a final order reserving the attorney fee request. This timely appeal ensued.

## II. ISSUES

The issues raised on appeal are restated as follows:

1. Whether the order before this court is final and appealable (raised by this court, *sua sponte*).

2. Whether the trial court erred in granting summary judgment to Paul, finding no genuine issues of material fact as to his actions in spending the Estate's funds without applying the prudent investor rule or making requisite findings of fact and conclusions of law.

3. Whether the trial court erred in denying the Estate's motion for summary judgment in light of undisputed facts and undisputed testimony of Paul that he spent $792,952.48 on the construction of a house that had an appraised value of $320,000 (but sold for $275,000).

4. Whether the trial court's denial of summary judgment was proper without making requisite findings of fact and conclusions of law.

5. Whether Paul is entitled to an award of attorney fees on appeal pursuant to the will.

## III. STANDARD OF REVIEW

Rule 56.04 of the Tennessee Rules of Civil Procedure states that a motion for summary judgment should only be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The standard of review following a trial court's decision on a motion for summary judgment is *de novo* with no presumption of correctness. *Tatham v. Bridgestone Ams. Holding, Inc.*, 473 S.W.3d 734, 748 (Tenn. 2015) (citing *Parker v. Holiday Hospitality Franchising, Inc.*, 446 S.W.3d 341, 346 (Tenn. 2014)).

When reviewing the evidence, this court must determine whether any factual disputes exist. *Byrd v. Hall*, 847 S.W.2d 208, 211 (Tenn. 1993). If a factual dispute exists, it must determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 265 (Tenn. 2015); *Byrd*, 847 S.W.2d at 211.

The moving party who does not bear the burden of proof at trial "may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence at the summary judgment stage is insufficient to establish the nonmoving party's claim or defense." *Rye*, 477 S.W.3d at 264. If the moving party satisfies the burden of production, the nonmoving party must respond by setting forth "specific facts showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. In evaluating the evidence in the summary judgment context, we must view the evidence in the light most favorable to the nonmoving party, and the court must draw all reasonable inferences in favor of that party. *Cumulus*

*Broad, Inc. v. Shim*, 226 S.W.3d 202, 373-74 (Tenn. 2007); *Abbott v. Blount Cnty.*, 207 S.W.3d 732, 735 (Tenn. 2006). Once the moving party demonstrates that there is no genuine issue of material fact, the nonmoving party must then prove, via affidavits or discovery materials, there is a genuine, material factual dispute to warrant a trial. *Fowler v. Happy Goodman Family*, 575 S.W.2d 496, 498 (Tenn. 1978); *Merritt v. Wilson Cnty. Bd. of Zoning Appeals*, 656 S.W.2d 846, 859 (Tenn. Ct. App. 1983). In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon its pleadings and must set forth specific facts showing that there is a genuine issue of material fact for trial. "If he does not so respond, summary judgment . . . shall be entered against him." *Id.*; *Byrd*, 847 S.W.2d at 211.

Once the moving party makes a properly supported motion for summary judgment, the burden shifts to the defendant to: (1) point to evidence establishing material factual disputes; (ii) rehabilitate the evidence attacked by the moving party; (iii) produce additional evidence establishing the existence of a genuine issue for trial; or (iv) submit an affidavit explaining the necessity for further discovery. Tenn. R. Civ. P. 56.06. Accordingly, the nonmoving party cannot simply claim that he/she might be able to come up with something at trial to negate an element of the moving party's claim at trial.

## IV. DISCUSSION

### a.

Upon our review of the procedural posture of this case, we find that this court has jurisdiction to consider this appeal: "Tenn. R. Civ. P. 54.02 is an exception to Rule 3 that permits the trial court, without permission from the appellate court, to certify an order as final and appealable, even if parts of the overall litigation remain pending in the trial court." *Johnson v. Nunis*, 383 S.W.3d 122, 130 (Tenn. Ct. App. 2012). It states that a trial court may certify as final an order that may direct the entry of a final judgment "as to one or more but fewer than all of the claims or parties" that is, certify an order that resolves an entire claim as to all parties or resolves all claims as to a particular party. *Shofner v. Shofner*, 181 S.W.3d 703, 713 (Tenn. Ct. App. 2004). It allows "the trial court to convert an interlocutory ruling into an appealable order." *Mann v. Alpha Tau Omega Fraternity*, 380 S.W.3d 42, 49 (Tenn. 2012).

In this case, the Estate sought a money judgment against Paul. That claim was completely disposed of by the trial court's grant of summary judgment to Paul. The Estate has no other pending issues before the trial court. The court properly certified in its order, "[T]here is no just cause for delay, and the clerk of the court is directed to enter this final judgment," as required under Rule 54.02.

**b.**

The construction of a will is a matter of law that we review de novo with no presumption of correctness. *In re Estate of Vincent*, 98 S.W.3d 146, 148 (Tenn. 2003). "The basic rule in construing a will is that the court shall seek to discover the intention of the testator, and will give effect to it unless it contravenes some rule of law or public policy." *Daugherty v. Daugherty*, 784 S.W.2d 650, 653 (Tenn. 1990). Pursuant to the language of Decedent's will, the personal representative was to distribute the assets equally among the four beneficiaries, share and share alike. Other relevant provisions of the will provide as follows:

### ITEM VI
### AUTHORITY TO ADMINISTER REAL PROPERTY

My Personal Representative shall have full authority and discretion to convey, improve, lease, encumber, or in any other manner deal with and administer any real property comprising an asset of my estate, without the approval of any court, the joinder of any beneficiary, or the disclosure of the identity of any beneficiary of my estate. Furthermore, for purposes of Tennessee Code Annotated, Section 31-2-103, all such real property shall be deemed to be personal property following my death, subject to sale by the Personal Representative acting without joinder of any beneficiary, for the purpose of facilitating the distribution of my estate among the beneficiaries of this Will, as well as for the purpose of paying taxes, administrative expenses, and any other expenses or debts of my estate, without first being required to exhaust all other personal property of my estate.

\* \* \*

### ITEM X
### POWERS OF PERSONAL REPRESENTATIVE

I hereby grant to my Personal Representative (including any substitute or successor Personal Representative) the continuing, absolute, discretionary power to deal with any property, real or personal, held in any trust, as freely as I might in the handling of my own affairs. Such power may be exercised independently and without the prior or subsequent approval of any court or judicial authority, and no person dealing with my Personal Representative shall be required to inquire into the propriety of any of his or her actions….

# ITEM XI
# INDEMNITY OF FIDUCIARY

Unless a Fiduciary acts capriciously and arbitrarily, my estate or a trust shall indemnify the Fiduciary for all expenses (including attorney fees) which he or she incurs or expends or which arises from the exercise of his or her discretion.

The duties of an estate's personal representative include "managing the decedent's estate." *In re Estate of Darken*, No. M2016-00711-COA-R3-CV, 2016 WL 7378806, at *6 (Tenn. Ct. App. Dec. 10, 2016). A personal representative occupies "a fiduciary position and, therefore, must deal with beneficiaries of the estate in utmost good faith." *Id.* (citing *In re Estate of Ladd*, 247 S.W.3d 628, 637 (Tenn. Ct. App. 2007). A fiduciary is obligated to exercise loyalty and honesty in administering his or her duties. *Roberts v. Iddins*, 797 S.W.2d 615 (Tenn. Ct. App. 1990); *Knox-Tenn Rental Co. v. Jenkins Ins., Inc.*, 755 S.W.2d 33 (Tenn. 1988).

The Estate contends that as a fiduciary of Decedent's estate, Paul had an affirmative duty to amass and preserve Decedent's assets and exercise the "same degree of diligence and caution that reasonably prudent business persons would employ in the management of their own affairs." *See Estate of Locke v. Garthright*, No. 1, 1991 WL 276801, at *4 (Tenn. Ct. App. Dec. 31, 1991) (citing *In re Estate of Inman*, 588 S.W.2d 763, 767 (Tenn. Ct. App. 1979); *In re Estate of Cuneo*, 475 S.W.2d 672, 676 (1971)); *Coffee v. Ruffin*, 44 Tenn. 487, 517 (Tenn. 1867) (cited in *In Re Estate of Schorn*, No. E2013-02245-COA-R3-CV, 2015 WL 1778292 (Tenn. Ct. App. Apr. 17, 2015). The obligations in handling an estate are as follows:

> In the custody, management and disposition of the estate committed to the charge of a personal representative, that person is bound to demonstrate good faith and to exercise that degree of diligence, prudence, and caution which a reasonably prudent, diligent and conscientious business person would employ in the management of their own affairs of a similar nature.

*In re Estate of Inman*, 588 S.W.2d at 767 (quoting Pritchard on Wills and Administration of Estates, § 95 (3d ed. 1955), *McFarlin v. McFarlin*, 785 S.W.2d 367, 369-70 (Tenn. Ct. App. 1989).

In order to recover for a breach of fiduciary duty, "a plaintiff must establish: (1) a fiduciary relationship, (2) breach of the resulting fiduciary duty, and (3) injury to the plaintiff or benefit to the defendant as a result of that breach." *Mitchell v. Morris*, No. E2015-01353-COA-R3-CV, 2016 WL 890212, at *9 (Tenn. Ct. App. Jan. 6, 2016) (citing

*Ann Taylor Realtors, Inc. v. Sporup*, No. W2010-00188-COA-R3-CV, 2010 WL 4939967, at 3 (Tenn. Ct. App. Dec. 3, 2010)).

Paul argues that this case should be viewed from his subjective "perspective" of what was in the best interest of the Estate. He claims that he had "freely" exercised the broad "full" and "absolute" authority that he had been granted under the will. He asserts that the decision to continue to work on the house after Decedent's death was made in good faith and was not arbitrary and capricious. He contends that he believed the expenditure of the funds on the house was in the best interest of the Estate and the beneficiaries to get the best value out of the house.

Notwithstanding what the jury has already determined, Paul stated under oath in a deposition in the present case that the $177,897.03 (in addition to the $615,055.45 in the 2014 case) was spent on building Decedent's home:

Q: Where was the 177 thousand dollars deposited?

A: In the SunTrust.

. . .

Q: And you don't know what these monies were used for other than to build the house once you deposited it into the estate?

A: Yes, I know exactly what they were used for.

Q: And that is?

A: A hundred thousand dollars to four different beneficiaries.

Q: Right.

A: And the rest was used for writing checks on these to build the house.

In response to the Estate's argument that the earlier jury "already ruled upon what Paul McMillin is to be credited with spending on the construction of the house," Paul argues that the final judgment in the prior lawsuit was a general verdict of the jury that did not make specific findings of fact. He contends that finding does not meet the elements of either *res judicata* or collateral estoppel.

In the view of the Estate, Paul's waste of the funds provided ample proof to the trial court that Paul violated the relevant standard, especially when it is recalled that the jury found that Paul and his wife converted hundreds of thousands of dollars from Decedent.

According to the Estate, even if the trial court believes that Paul spent the assets in good faith, the court failed to apply a "prudent manager" standard to determine whether the expense of $792,952.48, to build a home that only sold for $275,000 was "prudent." The Estate further contends that the trial court abused its discretion in overruling the summary judgment motion without providing any findings of fact or conclusions of law.

Our review reveals disputed issues of material facts that need to be addressed. Despite Paul's claims about higher offers to purchase the property, the Estate maintains that the real properties at 3600 and 3602 Guinn could not have been repaired, improved, or completed for sale with only relatively modest expenditures of additional funds.[6] The record before us indicates insufficient funds remained in the Estate account to fix the problems. Immediately preceding the approval of the sale by the Chancery Court, the Estate's checking account reflected a balance of $2,305.66, which would have done little toward resolving the remaining issues.[7] The Estate notes that Paul was overruled in his opposition to the sale of the property at 3602 Guinn Road by Chancellor Moyers. Further, the Estate recalls that Paul explicitly agreed to the sale of 3600 Guinn Road for $153,000 with no objection. However, the trial court did not appear to consider these prior rulings. Additionally, it made no mention of the following specific finding from a Master's Report of April 9, 2015:

> While there may be a difference of opinions about the construction deficiencies and existence of a sinkhole, the Clerk and Master reports that there is no dispute that the liquid assets in this estate are less than $3,000, that Paul is not going to pay the judgment (in favor of the Estate against Paul of $284,800), that the real estate taxes are delinquent, that the dwelling is incomplete and that insurance premiums in excess of $3,000 are coming due and payable.

Paul also urged the trial court to ignore the appraisal, jury verdict, and ultimate sale price of the 3602 Guinn Road property and look at a future sale price. The individual who bought the property from the Estate pursuant to the court order of May 12, 2015, purportedly sold the property 2.5 years later (October 31, 2017) for $467,500. However, it is unknown the expenses the buyer incurred to make the necessary repairs and to complete the construction in order to sell it for that amount. Thus, as argued by the Estate, reliance upon this speculative information by the trial court was improper.

Further, the court's ruling does not appear to have considered the undisputed fact of

---

[6]The new house, known as 3602 Guinn Road, and the original house, at 3600 Guinn Road, are both located on a tract of land containing approximately six acres. The tract was not subdivided to meet Knox County code requirements for the sale of a new dwelling.

[7]Paul claims that the $400,000 distributed to the beneficiaries was still "available" and could have been used to complete the unfinished house.

the total amount of money Paul claims he spent on building the incomplete house. The trial court seems to have neglected consideration of the Estate's brief and exhibits. A review of the trial court's memorandum reflects no analysis of the Estate's position.

Accordingly, we do not find that the record supports the trial court's entry of summary judgment. We must reverse and remand for trial.

### c.

Paul has moved for an award of attorney fees in the amount of $28,636.24 and expenses of $44.50. He also requests attorney fees on appeal. He contends that an award of expenses including attorney fees is warranted pursuant to Decedent's will. In that we are reversing and remanding this matter for a trial, however, no attorney fee request is ripe at this time.

## V. CONCLUSION

For the reasons stated, we reverse the decision of the trial court and remand for further proceedings consistent with this opinion. Costs on appeal are assessed to the appellee, Paul McMillin.

_____
JOHN W. MCCLARTY, JUDGE